Ex parte BRIDGES.
No. 1836.

District Court, N. D. California, N. D.
Feb. 8, 1943.

296

Lee Pressman, of Washington, D. C., Carol King, of New York City, and Gladstein, Grossman, Margolis & Sawyer, of San Francisco, Cal., for petitioner.

Frank J. Hennessy, U. S. Atty., and Louis R. Mercado, Asst. U. S. Atty., both of San Francisco, Cal., for respondent.

WELSH, District Judge.

The petitioner, Harry Bridges, an alien, in his application for the issuance of a writ of habeas corpus, attacks the legality of his detention by the United States Immigration Authorities, for deportation to Australia, on numerous grounds each of which will be considered. In answer to an order issued by this Court to show cause why the writ of habeas corpus should not be granted, the respondent, I. F. Wixon, as District Director, Immigration and Naturalization Service of the Department of Justice, made return that the peitioner is being detained "under and by virtue of a warrant of deportation duly and regularly issued by the Attorney General of the United States after a hearing duly and regularly held before a Presiding Inspector of the Immigration and Naturalization Service". The hearing referred to in the return constituted the second inquiry into the deportability of Harry Bridges. The entire record pertaining to the second deportation proceeding was submitted with the return. The petitioner's traverse thereto does not take issue with the verity of the record thus submitted, but rather with the sufficiency of the return to justify a denial of the writ. I have, therefore, examined the petition of Harry Bridges to determine if the same alleges grounds for the issuance of the writ, considering the sufficiency of the allegations contained in the petition in the light of what is revealed by the records of the Immigration Service pertaining to the proceedings culminating in the order of deportation against petitioner.

Petitioner invokes the protection of the double jeopardy clause of the 5th Amendment to the United States Constitution as a bar to the deportation proceedings resulting in his present detention. He contends that prior deportation proceedings taken against him in 1938 and 1939 involved the same charges, of which he was then cleared, as those involved in the later proceedings for which he is now being held for deportation.

I will not here consider the claimed identity of factual issues involved in the two deportation proceedings since in neither proceeding was petitioner charged with any offense within the meaning of the double jeopardy clause. And consequently there was no double jeopardy. The United States Supreme Court has held that a deportation proceeding is aimed at the revocation of a privilege and not as punishment for crime. Mahler v. Eby, 264 U.S. 32, 44 S.Ct. 283, 68 L.Ed. 549. And has stated that the consititutional protection against double jeopardy applies only to proceedings essentially criminal, of which nature proceedings in deportation do not partake. Helvering v. Mitchell, 303 U.S. 391, 398,

399 and footnote, page 399, 58 S.Ct. 630, 82 L.Ed. 917.

In the warrant of arrest which instituted the second deportation proceedings against petitioner on February 14, 1941, it was charged of petitioner that "after entering the United States he has been a member of or affiliated with an organization, association, society, or group that believes in, advises, advocates, or teaches the overthrow by force or violence of the Government of the United States; and that after entering the United States he has been a member of or affiliated with an organization, association, society, or group that writes, circulates, distributes, prints, publishes, or displays, or causes to be written, circulated, distributed, printed, published or displayed, or that has in its possession for the purpose of circulation, distribution, publication, issue or display, written or printed matter advising, advocating, or teaching the overthrow by force or violence of the Government of the United States."

His detention for deportation on these grounds, if established, is justified by the provisions of the Alien Registration Act of October 16, 1918, as amended by the Acts of June 5, 1920 and June 28, 1940, 8 U.S. C.A. § 137, as follows: "Any alien who was at the time of entering the United States, or has been at any time thereafter, a member of any one of the classes of aliens enumerated in this section, shall, upon the warrant of the Attorney General, be taken into custody and deported in the manner provided in sections * * * of this title. The provisions of this section shall be applicable to the classes of aliens mentioned in this act irrespective of the time of their entry into the United States."

One of the classes of aliens mentioned in the Act and to which the provisions of the above quoted excerpt apply are:

"Aliens who * * *, are members of or affiliated with any organization, association, society, or group, that believes in, advises, advocates, or teaches: (1) The overthrow by force or violence of the Government of the United States * * *."

"Aliens who are members of or affiliated with any organization, association, society, or group, that writes, circulates, distributes, prints, publishes, or displays, or causes to be written, circulated, distributed, printed, published, or displayed, or that has in its possession for the purpose of circulation, distribution, publication, issue, or display,

any written or printed matter of the character described in paragraph (d)."

Paragraph (d) mentioned in the above quotation refers to written or printed matter advising, advocating or teaching the overthrow by force or violence of the Government of the United States.

The order of deportation in the second proceeding is based upon the finding of the Attorney-General that after entering the United States in 1920, petitioner has been a member of the Communist Party of the United States, and affiliated therewith and with the Marine Worker's Industrial Union, and that these organizations are within the class proscribed by statute.

In the earlier deportation proceeding instituted against the petitioner in 1938 and terminating in his favor in 1939, the issue was confined to the alien's membership in or affiliation with the Communist Party of the United States at the time of the institution and prosecution of that proceeding. The issue was thus limited because of the decision of Kessler v. Strecker, 307 U.S. 22, 59 S.Ct. 694, 83 L.Ed. 1082, interpreting the Act of October 16, 1918, as it read prior to its amendment in 1940, to render an alien deportable upon proof of existing membership in or affiliation with proscribed organizations, but not because of any such past and discontinued membership or affiliation. The trial examiner in the first hearing found that the evidence did not establish existing membership or affiliation on the part of petitioner with the Communist Party of the United States and the Secretary of Labor, accordingly, dismissed the proceedings. By the amendment of June 28, 1940, Congress clarified its intent to include within the deportable class those aliens who, at any time since entry into the United States, have been members of or affiliated with organizations within the proscribed class, regardless of whether or not their membership or affiliation may have terminated before deportation proceedings against them were commenced. It was pursuant to this amendment that the second proceeding against petitioner was instituted to inquire into his deportability for past membership in or affiliation with organizations proscribed by law.

I do not consider tenable the argument of petitioner's counsel that the Act as amended in 1940, reasonably construed, should be held to refer to alien membership in or affiliation with proscribed organizations found to exist either at the time of the

alien's entry into the United States or at any time after passage of the 1940 amendment, but not to membership or affiliation having its inception after the alien's entry into this country but terminating before passage of the 1940 amendment. The Act as amended in 1940 provides for the deportation of any alien "who was at the time of entering the United States, or has been at any time thereafter" a member of or affiliated with the described organizations. This language is sufficiently plain in its application to all cases of such membership or affiliation shown to exist at the time of an alien's entry into the United States or at any time thereafter.

Petitioner claims that since the only evidence in the second proceeding which can support a finding of former membership in or affiliation with a proscribed organization on his part relates to a period of time antedating the passage of the 1940 amendment, that consequently, as applied to him, the 1940 amendment is an ex post facto law. Const. art. 1, § 9, cl. 3. It is not an ex post facto law because it is not a criminal law.

"It is well settled that deportation, while it may be burdensome and severe for the alien, is not a punishment. * * * The right to expel aliens is a sovereign power, necessary to the safety of the country, and only limited by treaty obligations in respect thereto entered into with other governments. * * * The inhibition against the passage of an ex post facto law by Congress in section 9 of article 1 of the Constitution applies only to criminal laws * * * and not to a deportation act like this * * *." Mahler v. Eby, 264 U.S. 32, 39, 44 S.Ct. 283, 286, 68 L.Ed. 549.

It appears from the findings and conclusions of the trial examiner at the first deportation hearing in 1939, that much of the evidence there relied on by the Government to substantiate its charge of the alien's deportability on the ground of existing membership in or affiliation with the Communist Party of the United States, related to past activities of Harry Bridges. This evidence was offered on the theory that such membership or affiliation, shown to have once existed, would be presumed to continue in the absence of proof to the contrary. It is petitioner's argument that although the issue of the first hearing was confined to the question of his existing membership in or affiliation with the Communist Party of the United States, this issue was determined in his favor only after an investigation into his activities ever since his entry into the United States in 1920; that the scope of inquiry in these two proceedings was co-extensive; that the decision of the trial examiner in 1939 that the Government failed to establish present membership or affiliation with the Communist Party of the United States necessarily involved a determination by him that it failed to establish any past membership or affiliation at any time since petitioner entered the United States, from which present membership or affiliation could be inferred; and that thus the question of the alien's deportability for membership in or affiliation with the Communist Party of the United States at any time was decided in his favor in 1939 and was res judicata and not open to further investigation thereafter.

Had the evidence offered in proof of petitioner's deportability been the same in each proceeding, petitioner might well argue a want of due process in subjecting him to deportation on the same ground supported by the same evidence which, after a full hearing before an impartial trial examiner, was found insufficient to establish his deportability. But such was not true in petitioner's case. Presiding Inspector Charles B. Sears, who heard the evidence in the 1941 hearing, stated on page 17 of his Memorandum of Decision, that "The evidence presented by the government before me is wholly different from that offered in 1939. Not a single witness sworn on the part of the government in this proceeding was sworn in the hearing of 1939. The charge stated in the warrant is different, for while it includes the charge which was the subject of the 1939 proceeding, it also includes a broader range, namely, membership in or affiliation with the organization at any time from the date in 1920 of the entry of the alien into this country." While the proof submitted at the second hearing on the issue of petitioner's membership and affiliation with the Communist Party of the United States, was, on the whole, new and different from that offered in the 1939 hearing, it must nevertheless be admitted that there was some evidence received at the second hearing which was also considered at the first hearing. This evidence is referred to in the footnote, on page 52, of the Memorandum of the Board of Immigration Appeals. The evidence was of a circumstantial nature relating to activities of petitioner allegedly consistent only with Communist Party

membership and affiliation, such as his association with known Communists and with the Marine Workers Industrial Union, his acceptance of Communist Party aid during the 1934 Maritime Strike and his policy of nondiscrimination against Communists in labor unions. At the first hearing, the trial examiner refused to draw any inference from this class of evidence unfavorable to the alien.

At the second hearing, this evidence was again considered and, weighed with new and additional proof of petitioner's Communist Party membership and affiliation, offered for the first time in 1941, was accorded a different interpretation. The re-evaluation of this evidence at the second hearing, in the light of further evidence not theretofore produced does not, in my estimation, correspond to a relitigation of the same issues on the same probative facts. I find no want of due process in thus reopening the investigation into the deportability of the petitioner on grounds supported by new and additional evidence not theretofore considered. Deportation is not punishment for crime. It is to remove aliens whose presence here is deemed inimicable to the welfare of the country. If this be so in any particular case, deportation cannot be frustrated by virtue of the occurrence of a prior investigation, which did not reveal all of the facts establishing cause for deportation.

Nor is there any merit to the contention that the doctrine of res judicata bars a re-inquiry into deportability. Deportation proceedings are administrative, not judicial. And a decision in a deportation proceeding is an executive decision, not a judicial determination. Decisions of the executive department do not constitute res judicata. Pearson v. Williams, 202 U.S. 281, 26 S.Ct. 608, 50 L. Ed. 1029; Flynn v. Ward, 1 Cir., 95 F.2d 742.

Petitioner claims he has been denied the equal protection of laws and thus has been deprived of due process of law. He alleges that on January 3, 1934, the Department of Labor ruled that membership in or affiliation with the Marine Worker's Industrial Union was not grounds for deportation and that ever since that time, no alien save petitioner has been subjected to deportation for membership in or affiliation with that organization, although there are thousands of aliens in the United States known by the Department of Labor and the Department of Justice to have been members of and affiliated with the Marine Worker's Industrial Union. Concededly, the discriminatory exercise of a discretionary power vested by law in an administrative agency may constitute a denial of the constitutional guarantee of equal protection of laws, Const. Amend. 14, § 1, to those discriminated against. But here, the obligation imposed by the Act of October 16, 1918, upon first, the Secretary of Labor and later, the Attorney-General, to deport those aliens therein designated as deportable, is mandatory and not discretionary. A failure on the part of the agency charged with this positive duty, to act in other proper cases, whatever the reason may have been that prompted the inaction, cannot on any constitutional grounds result in a grant of immunity from deportation to petitioner if he in fact comes within that class of aliens which Congress has decreed by law to be subject to deportation. Thompson v. Spear, 5 Cir., 91 F.2d 430, 434.

The contention of petitioner that it was the sole object of Congress, in enacting the Amendment of 1940 to the Act, to effect his deportation, is answered by the following pertinent language taken from the case of Soon Hing v. Crowley, 113 U.S. 703, 5 S.Ct. 730, 734, 28 L.Ed. 1145:

"And the rule is general, with reference to the enactments of all legislative bodies, that the courts cannot inquire into the motives of the legislators in passing them, except as they may be disclosed on the face of the acts, or inferable from their operation, considered with reference to the condition of the country and existing legislation. The motives of the legislators, considered as to the purposes they had in view, will always be presumed to be to accomplish that which follows as the natural and reasonable effect of their enactments. Their motives, considered as the moral inducements for their votes, will vary with the different members of the legislative body. The diverse character of such motives, and the impossibility of penetrating into the hearts of men and ascertaining the truth, precludes all such inquiries as impracticable and futile."

The Act of October 16, 1918, as amended, is assailed upon the ground that

it allegedly violates the constitutional right of free speech and freedom of assembly, Const. Amend. 1, in that it renders aliens deportable for membership in or affiliation with organizations whose activities do not present a clear, serious or imminent danger of accomplishing any substantive evil which the statute is designed to avert. This argument necessarily assumes that Congressional power over the admission and expulsion of aliens is not unrestricted, but that it may only be exercised within the bounds of constitutional limitations. There are indications that the law of the land is to the contrary. In Chuoco Tiaco v. Forbes, 228 U.S. 549, 33 S.Ct. 585, 586, 557, 57 L.Ed. 960, 965, there was involved the question of the legality, in view of the due process clause of the Philippine Bill of Rights, of the action of the Philippine Government through its Governor-General and Legislature, in summarily ordering the deportation of a named alien. In affirming the order of deportation, Justice Holmes stated:

"It is admitted that sovereign states have inherent power to deport aliens, and seemingly that Congress is not deprived of this power by the Constitution of the United States. * * * Furthermore, the very ground of the power in the necessities of public welfare shows that it may have to be exercised in a summary way through executive officers. * * * So that the question is narrowed further to the inquiry whether the Philippine government cannot do what unquestionably Congress might.

"As Congress is not prevented by the Constitution, the Philippine government cannot be prevented by the Philippine Bill of Rights alone."

I do not consider it necessary to uphold the validity of the Act of Congress in this case upon the broad principle that Congress may, as an incident of sovereignty, expel resident aliens on any or no ground at all. For Congress undoubtedly may, within the bounds of constitutional limitations, enact legislation looking toward the expulsion of aliens whose course of conduct while residents of this country, has marked them with the possession of qualities which can reasonably be said to render their continued presence here undesirable in the interests of public welfare. By the Act of October 16, 1918, as amended in 1940, Congress has classified within the category of aliens whose presence it deems inimicable to the welfare of this country, those aliens who, through past participation by membership in or affiliation with subversive organizations, have indicated at least a one-time disposition of hostility toward our established form of government and a willingness to see it destroyed by force and violence. In subjecting such aliens to deportation, it cannot be said that Congress has acted capriciously. Although such aliens may have discontinued their subversive affiliations, they nevertheless have manifested a spirit of disloyalty; they have shown a willingness to accept the hospitality and protection offered them by this country while participating in activities designed, not toward peaceable and constitutionally authorized changes in its government, but rather toward the eventual revolutionary and violent overthrow of the government whose protection they have enjoyed. The Congressional assumption that such aliens do not constitute desirable material for residents or citizens of this country is not arbitrary and unreasonable and consequently, it is not in excess of Congressional power to provide for their deportation. If the result is a curtailment of their freedom of speech while in this country, it is a curtailment consonant with the constitutional guarantees of the Bill of Rights.

"It is a fundamental principle, long established, that the freedom of speech and of the press which is secured by the Constitution, does not confer an absolute right to speak or publish, without responsibility, whatever one may choose, or an unrestricted and unbridled license that gives immunity for every possible use of language and prevents the punishment of those who abuse this freedom." Gitlow v. People of the State of New York, 268 U.S. 652, 666, 45 S.Ct. 625, 630, 69 L.Ed. 1138.

Congressional power over the deportation of undesirable aliens is co-existent with guaranteed freedom of speech. Both should be so construed that the efficacy of neither is thereby destroyed. I see no cause for complaint that Congress has not confined itself to the deportation of alien members or affiliates of those subversive organizations only whose activities present a clear, serious or imminent danger of accomplishing the evil which the legislation is designed to prevent. Aliens who, by their associations, have evidenced be-

lief in the forcible and violent overthrow of our Government, become none the more desirable material for residents or citizens of this country because their views do not embrace the conception of immediate revolution but are directed rather to forcible and violent overthrow of organized government at some indefinite future period when the opportune moment may present itself.

■■■■ Petitioner argues that the Act of October 16, 1918, as amended, should be construed to refer only to aliens who are shown to have been possessed of knowledge of the proscribed character of the organization with which they have affiliated themselves; that otherwise, the Act would lack the essential element of due process. Congress has made alien membership in or affiliation with proscribed organizations grounds for deportation without reference to knowledge on the alien's part of the proscribed character of the organization with which he has affiliated himself. The act is not ambiguous in this regard and offers no room for the play of judicial interpretation of legislative intent. Nor is the legislation wanting in due process because it decrees deportation to be the consequence of acts voluntarily done regardless of the state of intent of the doer. In the law of crimes, unlawful acts intentionally only in the sense of voluntarily done may, without violating the due process clause, be punished although the doer did not know of the unlawful nature of his acts and intended no wrong. Shevlin-Carpenter Co. v. State of Minnesota, 218 U.S. 57, 30 S.Ct. 663, 54 L.Ed. 930; State v. Hennessy, 114 Wash. 351, 195 P. 211. I do not believe that Congress acted arbitrarily in failing to consider the state of mind of an alien affiliating himself with a proscribed organization. It is reasonable to presume that a person is cognizant of the character of an organization with which he associates himself. On the other hand, proof of his actual state of mind is difficult and, in many instances, impossible. These considerations, in my opinion, afford adequate warrant, in the interests of public welfare, for the application of the deportation statute under consideration to all alien members or affiliates of proscribed organizations without regard to their intent in becoming such. Its application in individual cases will conceivably work hardship on aliens innocent of any seditious designs. However, it is not the function of this court in this habeas corpus proceeding to consider the wisdom of legislation, but only its constitutionality.

Petitioner's remaining claims of illegal detention are directed to alleged unfairness of the deportation hearing and inadequacy of the evidence to support the order of deportation resulting in a claimed want of due process. The attack on the fairness of the proceedings will be first considered.

Petitioner asserts that the Presiding Inspector denied him his constitutional right to procedural due process in the following particulars: that he was not given a sufficient opportunity to prepare his defense; that he was denied adequate prior notice of the nature of the charges lodged against him which, as described in the warrant of arrest, were too indefinite to apprise him of the organizations with which it was alleged he was affiliated; that he was refused an opportunity to examine Federal Bureau of Investigation reports or other evidence on which the warrant of arrest was issued, and was denied a list of the witnesses whose statements were taken by the Department of Justice and on whose evidence the Government relied in issuing the warrant of arrest.

The record establishes that petitioner was served with a warrant in the second proceeding on February 14, 1941, and six weeks later, on March 31, 1941, the hearing before Presiding Inspector Charles B. Sears opened. The hearing lasted almost two and one-half months. At its commencement, the Presiding Inspector announced that, "* * * if in the course of this hearing it seems reasonable that some opportunity should be given to Mr. Bridges to investigate any subject· arising in the hearing, I will take that into consideration and will endeavor to give Mr. Bridges full opportunity, reasonably, to make investigation of the matters which are brought before him of which it might be said he had no knowledge or information." Transcript, p. 22. The record shows that this policy of fairness was studiously pursued throughout the hearing, and refutes petitioner's contention that, by limitation of time, he was deprived of adequate opportunity to prepare his defense.

When the hearing opened before Presiding Inspector Sears, Mr. Goodwin for the Government, made an opening statement in which he designated by name, the organizations of which petitioner was charged to have been a member and affiliate. Petitioner did not, prior to the commencement

of the hearing, request any bill of particulars asking for the names of the organizations referred to in the warrant of arrest. In the first deportation proceeding, the petitioner made such a request and the Government complied therewith, naming the Communist Party of the United States. Findings of Trial Examiner Landis, p. 1. The assumption is justified that petitioner was not surprised when, at the opening of the second hearing, Government counsel again designated the Communist Party of the United States as one of the proscribed organizations involved in the second hearing. If the fact is that petitioner became cognizant for the first time at the opening of the second hearing, that he was also being charged with affiliation with the Marine Worker's Industrial Union, he had two and one-half months thereafter, while the hearing progressed, to meet this additional charge.

 The request of petitioner to be informed, prior to the second hearing, of the evidence on which the warrant issued and the names of the witnesses upon which the Government would rely in proving its case, was denied. Petitioner does not claim the right to such information in advance of the hearing by virtue of any rule of the Department of Justice. Due process does not, as a matter of law, require these steps to be taken in an administrative proceeding. And I do not see wherein the denial of petitioner's request for this information resulted in an unfair hearing. During the course of the second hearing, lasting almost two and one-half months, petitioner was represented by counsel; he became fully acquainted with the nature of the charges made against him and was confronted with the evidence upon which they were based. He was given full opportunity to cross-examine Government witnesses and had ample time and opportunity to present competent evidence in refutation of the charges made against him. In Seif v. Nagle, 14 F.2d 416, 417, the Circuit Court of Appeals of this Circuit stated:

"The objection that the alien was not permitted to examine the warrant of arrest, that the warrant was not read to him, and that the evidence upon which it was based was not shown to him, as required by rules 4 and 22, governing procedure by the Department of Labor, is not of vital importance, provided the alien had a fair hearing."

 Petitioner avers he was denied due process because of certain alleged erroneous rulings of the Presiding Inspector made in the course of the hearing. He complains of the refusal of the Presiding Inspector to grant his request for subpoenas and subpoenas duces tecum for officials of the Department of Labor and the Immigration and Naturalization Service of the Department of Justice. Petitioner sought to establish through them and documents under their control that on January 3, 1934, the Immigration and Naturalization Service ruled that membership in or affiliation with the Marine Worker's Industrial Union was not grounds for deportation; and that ever since said ruling, no alien save petitioner has been subjected to deportation proceedings because of affiliation with the Marine Worker's Industrial Union, although there were thousands of alien members and affiliates of such organization in the United States. The evidence sought was intended to show that the deportation proceedings instituted against petitioner operated to deny him equal protection of laws and, consequently, due process of law. I have already ruled that petitioner was not deprived of the equal protection of laws by virtue of the facts sought to be established through this line of evidence and, therefore, find no error or want of due process in the ruling of the Presiding Inspector refusing to issue subpoenas for the production of such evidence.

 Petitioner also complains that he was denied the opportunity of proving a ruling of the Commissioner of Immigration in 1934 to the effect that membership in the Marine Worker's Industrial Union should not be used as the sole ground for an alien's deportation, and a letter written by such Commissioner in December 19, 1934, to the Chief of Police at Phœnix, Arizona, stating that the Department of Labor had sworn statements in its files to the effect that the Trade Union Unity League, of which the Marine Worker's Industrial Union was a subsidiary, had, on July 1, 1933, adopted a resolution severing connection with the Red International of Labor Unions. Although this proffered evidence was excluded by the Presiding Inspector, it was nevertheless considered and weighed by him. Inspector Sears, on page 61 of his Memorandum, stated in regard to this ruling and letter:

"I excluded from evidence the advisory ruling and letter, but in considering this

matter, I have treated these documents in the same manner as if they were actually in evidence. The advisory ruling was simply a factual determination for the guidance of administrative officials and has no binding effect in this proceeding. The letter contains only hearsay of the weakest variety and has no other substantiation."

 Petitioner complains that he was not permitted to examine prior statements of government witnesses made to agents of the Federal Bureau of Investigation, and that the denial of his request for the production of these statements constituted error. He desired these statements for whatever value they may have been to him in the cross-examination of witnesses and for impeachment purposes in the event they may have been found to contain contradictory statements. Petitioner's Opening Brief, p. 188. However, petitioner made no showing, in support of his request for these prior statements, that they actually contained contradictions to testimony later given on the stand, nor does the record indicate in any way that such was the fact. There is no claim made that the government suppressed evidence favorable to the alien and no such presumption can justifiably be indulged in because of the Government's refusal to produce prior statements of its witnesses. Concededly, without these prior statements, the latitude of petitioner's cross-examination may have been restricted; and better administrative practice might dictate a policy of disclosure of prior statements of witnesses. But I cannot say that the Government's refusal to disclose such prior statements rendered the hearing so essentially unfair as to result in a want of due process. Petitioner was confronted with all of the witnesses whose testimony was considered in arriving at the final decision to deport him, and was given the opportunity of cross-examining these witnesses. He was permitted to produce evidence in his own behalf and subpoenas were issued at petitioner's request, whenever properly made, except in the case mentioned on page 9 of Inspector Sears' Memorandum and previously referred to and discussed in this opinion. I am satisfied that due process was accorded him throughout the hearing before Inspector Sears.

At the conclusion of the hearing before the Presiding Inspector, briefs were filed by counsel for the Government and the petitioner. In these briefs, the factual issues involved in the deportation proceeding, and the evidence relating thereto were argued at length. Argument was also made on the constitutional and legal issues which are being raised by petitioner in this court. Thereafter, Presiding Inspector Sears, in accordance with Departmental regulations, prepared a memorandum of decision and transmitted the same to the Office of the Attorney General, together with the 7,545 page transcript of the hearing and accompanied by the numerous exhibits filed in the proceeding. The Memorandum of Decision prepared by the Presiding Inspector contains a summary and analysis of the evidence, and assigns reasons for the weight and evaluation accorded the same. The constitutional and legal issues involved were also considered, and an opinion was expressed with reference thereto. The conclusion reached by the Presiding Inspector was that the evidence established that since his entry into the United States, the petitioner has been a member of the Communist Party of the United States, and has been affiliated with that party and with the Marine Worker's Industrial Union; and that these two organizations are within the class of organizations proscribed by the deportation statute. And appropriate findings, conclusions and order were proposed. Petitioner excepted to the proposed findings, conclusions and order of the Presiding Inspector, and the matter came before the Board of Immigration Appeals, a board established in the office of the Attorney-General and performing such powers as are conferred upon it by direction of the Attorney-General. The legal and factual issues were again briefed and there was also oral argument before the Board of Immigration Appeals. The Board found that the greater weight of the evidence did not establish that petitioner was at any time a member of or affiliated with either organization in question. The Board did not express its opinion on the character of these organizations or the legal issues raised, save as to its interpretation of the legal meaning of the term "affiliation". The opinion of the Board carefully weighed and analyzed the evidence bearing on the issue of petitioner's alleged membership and affiliation with the organizations involved, and the conflict on these factual issues were resolved in petitioner's favor. On January 3, 1942, the Board of Immigration Appeals made the following order: "The warrant of ar-

rest and bond are cancelled and the proceedings closed. Execution of this order is stayed pending further order of the Attorney-General or of this Board." On May 28, 1942, the Attorney-General rendered his opinion, in which he adopted the findings and conclusions proposed by the Presiding Inspector and ordered the deportation of petitioner. The Attorney-General's opinion in support of the conclusion therein reached, is interspersed with numerous references to Inspector Sears' Memorandum, the Board Memorandum, the transcript of the hearing and exhibits filed, and to legal authority deemed controlling. It evinces a careful examination of the record and studied deliberation. Any further inquiry into his mental processes is unwarranted in this proceeding.

 In view of the facts related in the foregoing paragraph, which find support in the record before me, I reject petitioner's contention, made on information and belief, that the Attorney-General reached his decision without reading the record of the second hearing, or that he was motivated by information extraneous to the record or by any other improper influences in reaching his conclusions; or that his findings and conclusions were based on any consideration save that of the evidence in the case appearing from the record submitted to him, and the law deemed applicable thereto.

 Nor do I think that under the circumstances here present, the petitioner was in any way deprived of a fair hearing because he may have lacked the opportunity of arguing his case further before the Attorney-General, or by reason of a procedural defect, if any there was, in the manner of certifying the case from the Board of Immigration Appeals to the Attorney-General. Petitioner filed briefs with the Presiding Inspector and with the Board of Immigration Appeals. His side of the case, on the facts, was well presented in the opinion of the Board of Immigration Appeals. These documents were all a part of the record submitted to the Attorney-General. Petitioner makes no claim that had he been given the opportunity of arguing his case further before the Attorney-General he would have raised any point which had not been fully covered already in his briefs on file or in the Board Memorandum. The failure to afford petitioner the opportunity of re-arguing his side of the case before the Attorney-General did not deny him due process.

 It is claimed that the Attorney-General was without power to overrule the decision of the Board of Immigration Appeals, since there was substantial evidence to support the same. Section 90.12 of the Regulations of the Department of Justice, Immigration and Naturalization Service, empowers the Attorney-General to review the decision of the Board and to reverse that decision stating in writing his conclusions and the reasons for his decision. This regulation does not limit the review of the Board's decision to the determination solely of whether there was substantial evidence to support the same. In my opinion, it is consonant with the purport of this regulation and the requirements of fair play, for the Attorney-General upon reference of the case to him for final decision, to contrast the Board's opinion with that of the Presiding Inspector upon whom is imposed, by departmental rules, the duty of making his recommendations regarding the decision which should properly be reached on the evidence adduced before him, and to study such evidence and if satisfied therefrom that the greater weight thereof supports the proposed findings and conclusions of the Presiding Inspector, to adopt his proposals as the final decision in the matter. A deportation proceeding is administrative, not judicial, in nature. The rules applicable to judicial proceedings do not govern. Due process in deportation hearings does not require any particular form of procedure, only that the form adopted afford the alien a fair hearing and that any order of deportation made against him be based on substantial evidence.

 Petitioner alleges that he has been denied a fair hearing in that, "The Attorney-General's decision fails to consider the presumption adverse to the Government created by the knowing and wilful use by Government representatives of false testimony against petitioner." The allegations of the petition do not state what testimony is alleged to be false, the materiality thereof, what government representatives are alleged to have knowingly used the same against petitioner, what knowledge of the alleged falsity thereof the Attorney-General possessed, or whether the order of deportation was based on such testimony. I do not con-

sider petitioner's allegations adequate to warrant the issuance of the writ on the ground that facts have been stated which, if true, would establish want of due process in the deportation proceeding taken against him. From petitioner's brief is gleaned the information that the witness alleged to have testified falsely is Maurice Cannalonga. His testimony claimed to be false is that given at the hearing on June 4, 1941 to the effect that he was drunk when he gave a statement under oath in Portland, Oregon, on May 4, 1941 contradicting his testimony previously given at the hearing on April 17, 1941. Whether or not Cannalonga was drunk when he gave the statement under oath which he later repudiated is not material to any of the issues in the deportation proceeding. Nor does it appear that any portion of his testimony which was material to the issues actually weighed to any substantial extent in the conclusion arrived at by the Attorney-General. Therefore, assuming the testimony of Cannalonga to have been false, petitioner's cause was not prejudiced since the Presiding Inspector gave no weight at all to the same, (Sears' Memorandum, page 152) and the Attorney-General, but passing and negligible consideration. Attorney-General's Opinion, page 25.

Petitioner does not allege that the order of deportation made against him resulted from the introduction of known perjured testimony. He does not thereby bring himself within the rule of law announced in the case of Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791, 98 A.L.R. 406, that a conviction based on perjured testimony knowingly used by the prosecuting authorities is void. It is not here claimed that Cannalonga's testimony was the basis for the order of deportation, or that the evidence relied on to support the order of deportation was fabricated. All petitioner claims is that some testimony was introduced which was known to be false by those government representatives responsible for its production, and that the Attorney-General, in his decision, failed to consider a presumption adverse to the Government resulting from the same. The record does not establish and there is no presumption that Cannalonga was produced with knowledge that he intended to give false testimony or that his testimony was in fact

false. There is no allegation that the Attorney-General knew facts extraneous to the record which put him on notice that the testimony of Cannalonga was false or knowingly fabricated. He cannot be charged with having committed error in failing to consider a presumption unless he is also chargeable with knowledge of the facts giving rise to the presumption.

I am satisfied of the fairness of the hearing accorded petitioner throughout the second deportation hearing.

There remains the question of the existence of substantial evidence to support the order of deportation.

The Attorney-General found from the evidence that the Communist Party of the United States of America, and the Marine Worker's Industrial Union, advocated the overthrow of the Government of the United States by force and violence, and otherwise came within the purview of the deportation statute; and that subsequent to petitioner's entry into the United States, and while these organizations were within the class proscribed by law, petitioner has been a member of the Communist Party of the United States of America and affiliated therewith and with the Marine Worker's Industrial Union.

In the course of the deportation proceeding, petitioner did not attack the sufficiency of the evidence with respect to the proscribed character of the organizations in question. The evidence in support of the findings relating to their character is summarized by Inspector Sears in his Memorandum at pages 18–82, and referred to in the Opinion of the Attorney-General at pages 7–10. The evidence there summarized fully supports the findings based thereon, and it is not the function of this court to further review the same.

On the finding of the petitioner's membership and affiliation with the Communist Party of the United States, the evidence chiefly relied on was the testimony of Harry Lundberg that petitioner had admitted Communist Party membership to him in 1935, and evidence of statements made by James O'Neil to government representatives on two occasions in the course of the investigation into the deportability of petitioner, that he had seen petitioner posting assessment stamps in a Communist Party membership book, and that petitioner had reminded O'Neil to attend Party meetings.

If the statements of James O'Neil had been the only proof upon which depended the attribution of Communist Party membership and affiliation to petitioner, I would not hesitate to find a complete want of substantial evidence to support the order of deportation on that ground. The statements testified to were unsigned and unsworn and there is no proof that O'Neil was asked to sign or swear thereto, or being asked, refused to do so. Consequently, their introduction in evidence, as affirmative proof of the facts allegedly stated was violative of controlling departmental regulations. § 150.1(c) of the Regulations of the Department of Justice, Immigration and Naturalization Service. The fact that no objection was made to the use of the statements in evidence on that ground, would not seem to justify their introduction by the Government contrary to its own regulations. Moreover, the statements were pure hearsay. The opportunity of cross-examining O'Neil was entirely lacking because he denied having made any portion of the statements attributed to him which was damaging to petitioner. In my opinion, the requirements of a fair hearing would not have been fulfilled if the order of deportation in this case had been based solely on this hearsay evidence, introduced in violation of departmental regulations, and consisting of proof of prior contradictory statements of a witness, offered as affirmative proof of the facts stated, with no opportunity of cross-examination being afforded the alien because the witness denies having made the statements attributed to him. However, the fact that such statements were admitted in evidence and given weight did not invalidate the proceedings if there was other substantial evidence relied on to support the order made. The admission of hearsay evidence does not of itself operate to render unfair the entire hearing. Ex parte Shigenari Mayemura, 9 Cir., 53 F.2d 621.

"Moreover, a hearing granted does not cease to be fair, merely because rules of evidence and of procedure applicable in judicial proceedings have not been strictly followed by the executive; or because some evidence has been improperly rejected or received. * * * To render a hearing unfair the defect, or the practice complained of, must have been such as might have led to a denial of justice, or there must have been absent one of the elements deemed essential to due process." (United States ex rel. Bilokumsky v. Tod, 263 U.S. 149, 157, 44 S.Ct. 54, 57, 68 L.Ed. 221.)

Here, there is the testimony of Harry Lundberg that in 1935, petitioner admitted his Communist Party membership to him. Lundberg's testimony is outlined in the summary of the evidence by Inspector Sears at pages 104–107 of his Memorandum of Decision. Petitioner objects to Lundberg's testimony because he showed himself to be a biased and prejudiced witness; that he had previously denied knowledge of any Communistic affiliations of Bridges; that his uncorroborated testimony of oral admissions of petitioner is in its nature essentially weak. Conceding all this, these are considerations affecting the weight and credibility of the evidence and not its competency and admissibility as proof of the fact. The determination as to the weight of evidence or as to the credibility of witnesses in a deportation proceeding is exclusively for the immigration authorities, in the absence of a showing that their action in this regard is arbitrary. I cannot say, as a matter of law, that the testimony of Harry Lundberg is so unsubstantial as to lend no support to a finding based thereon of past Communist Party membership and affiliation by petitioner. Particularly is this so in view of the fact that there is other evidence in the record of a circumstantial nature which, while not of itself sufficient to show proscribed membership and affiliation, does tend to lend credence to the testimony of Lundberg that in 1935 petitioner had admitted to him Communist Party membership. This evidence is reviewed in the opinion of the Attorney-General at pages 23 to 27. It consists of statements, conduct and activities of petitioner held to show a sympathetic and co-operative attitude toward the Communist Party and other Communist organizations, and a close association and co-operation with known members of the Communist Party.

There is also evidence to support the finding of the Attorney-General on the issue of petitioner's affiliation with the Marine Worker's Industrial Union in the proof connecting him with the "Waterfront Worker" as co-editor of that paper while it was a publication of the Marine Worker's Industrial Union and, as such, followed a policy of support to Communist sponsored organizations and Communist Party candidates for political office, and advocated

the reading of Communist literature. There is a sharp conflict in the evidence with regard to when the petitioner first became connected with the paper, petitioner claiming that he had nothing to do with the publication prior to September 15, 1933 and that at that time, it was no longer an organ of the Marine Worker's Industrial Union. The Attorney-General determined that Bridges first became connected with the "Waterfront Worker" in December, 1932, and that his connection therewith continued throughout the paper's existence to 1936; and that during the entire time of petitioner's connection with the paper, it was an instrument of the Marine Worker's Industrial Union which was, in turn, an affiliate of the Communist Party of the United States. The conclusion thus drawn from the facts in evidence is not, in my opinion, unwarranted. The evidence with regard to the "Waterfront Worker" is summarized and analyzed by the Presiding Inspector in his Memorandum at pages 88 to 98. There is, further, the evidence that petitioner in 1934, recruited numerous members for the Marine Worker's Industrial Union.

Petitioner asserts that the deportation statute contains no reasonably ascertainable standard as to what acts or conduct are therein proscribed. I cannot agree. The statute specifically proscribes membership in and contribution of funds to subversive organizations. Congress has thus expressed its policy of deporting aliens who lend their active support and assistance to a proscribed organization in a manner reasonably calculated to add to its strength and consequent ability to further all of its aims and objects, including those of a subversive nature. The conduct condemned is that which can reasonably be said to support the progress of proscribed organizations towards the recognition of their ultimate unlawful goal. It is this line of conduct which renders aliens, though non-members, nevertheless affiliates of proscribed organizations. Tested by this standard, it is my opinion that the evidence in the record hereinbefore referred to, substantially supports the finding of petitioner's affiliation with the Marine Worker's Industrial Union.

Petitioner's motion to Inspector Sears for an order for the examination of witnesses in regard to the alleged use of wire tapping tactics against petitioner by the Federal Bureau of Investigation was properly denied. The motion was based upon the claim of petitioner that wiretapping was employed against him subsequent to the second hearing. If this be true, it affords no basis for the contention of petitioner that any of the evidence introduced against him at the second hearing was obtained by the use of illegal tactics.

I conclude that the record of the second proceeding inquiring into the deportability of petitioner, Harry Bridges, establishes that the order of deportation against petitioner was made after a fair hearing on substantial evidence, and no error of law occurred which operated to deprive petitioner of due process of law or any other of his constitutional rights.

The two motions pending before this Court for the issuance of subpoenas and subpoenas duces tecum for the purpose of taking depositions is therefore denied, and;

It is ordered, that the petition of Harry Bridges for a writ of habeas corpus be and the same is hereby denied, and petitioner is remanded into the custody of the respondent.