## BRIDGES *v.* WIXON, DISTRICT DIRECTOR, IMMIGRATION AND NATURALIZATION SERVICE, DEPARTMENT OF JUSTICE.

No. 788.   Argued April 2, 3, 1945.—Decided June 18, 1945.

136

*Messrs. Lee Pressman* and *Richard Gladstein,* with whom *Mrs. Carol King* and *Mr. Aubrey Grossman* were on the brief, for petitioner.

*Solicitor General Fahy,* with whom *Assistant Attorney General Tom C. Clark, Messrs. Robert S. Erdahl* and *Leon Ulman* were on the brief, for respondent.

*Messrs. Arthur Garfield Hays, Bartley C. Crum, Isaac Pacht, A. L. Wirin* and *Osmond K. Fraenkel* filed a brief on behalf of the American Civil Liberties Union, as *amicus curiae,* in support of petitioner.

*Miss Pearl M. Hart* and *Mr. Carl S. Stern* filed a brief on behalf of the American Committee for Protection of Foreign Born, as *amicus curiae,* urging reversal.

*Messrs. Ralph B. Gregg, W. Coburn Cook, Wallace L. Ware* and *Seth Millington* filed a brief on behalf of the American Legion, as *amicus curiae,* urging affirmance.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Harry Bridges is an alien who entered this country from Australia in 1920. In 1938 deportation proceedings were instituted against him on the ground that he both had been and then was a member of or affiliated with the Communist Party of the United States and that that party advised and taught the overthrow by force of the govern-

ment of the United States and caused printed matter to be circulated which advocated that course. Under the statute then in force, past membership or past affiliation was insufficient for deportation, present membership or present affiliation being required. *Kessler* v. *Strecker,* 307 U. S. 22. A hearing was had. The examiner, Hon. James M. Landis, concluded that the evidence established neither that Harry Bridges "is a member of nor affiliated with" the Communist Party of the United States. The Secretary of Labor sustained the examiner and dismissed the proceedings. That was in January 1940. By the Act of June 28, 1940, Congress amended the statute so as to provide for deportation of any alien who was "at the time of entering the United States, or has been at any time thereafter" a member of or affiliated with an organization of the character attributed to the Communist Party in the first proceeding.[1] A second deportation proceeding was instituted

---

[1] The statute as amended (40 Stat. 1012, 41 Stat. 1008, 54 Stat. 673, 8 U. S. C. § 137) provides in part as follows:

"That any alien who, at any time, shall be or shall have been a member of any one of the following classes shall be excluded from admission into the United States:

. . . . .

"(c) Aliens . . . who are members of or affiliated with any organization, association, society, or group, that believes in, advises, advocates, or teaches: (1) the overthrow by force or violence of the Government of the United States . . .

. . . . .

"(e) Aliens who are members of or affiliated with any organization, association, society, or group, that writes, circulates, distributes, prints, publishes, or displays, or causes to be written, circulated, distributed, printed, published, or displayed, or that has in its possession for the purpose of circulation, distribution, publication, issue, or display, any written or printed matter of the character described in subdivision (d) [advising, advocating or teaching the overthrow by force or violence of the Government of the United States].

"For the purpose of this section: (1) the giving, loaning or promising of money or any thing of value to be used for the advising, advocacy, or teaching of any doctrine above enumerated shall con-

against Harry Bridges under the amended statute on the ground that he had been a member of or affiliated with that organization.[2] Another hearing was had. The inspector designated to conduct the hearings and make a report, Hon. Charles B. Sears, found that the Communist Party of the United States was an organization of the character described in the statute, that the Marine Workers' Industrial Union was affiliated with the Communist Party and was an organization of the same character, and that after entering this country Harry Bridges had been affiliated with both organizations and had been a member of the Communist Party. He recommended deportation. The case was heard by the Board of Immigration Appeals[3] which found that Harry Bridges had not been

---

stitute the advising, advocacy, or teaching of such doctrine; and (2) the giving, loaning or promising of money or any thing of value to any organization, association, society, or group, of the character above described shall constitute affiliation therewith; but nothing in this paragraph shall be taken as an exclusive definition of advising, advocacy, teaching, or affiliation.

"Sec. 2. Any alien who was at the time of entering the United States, or has been at any time thereafter, a member of any one of the classes of aliens enumerated in section 1 of this Act, shall, upon the warrant of the Attorney General, be taken into custody and deported in the manner provided in the Immigration Act of February 5, 1917. The provisions of this section shall be applicable to the classes of aliens mentioned in this Act, irrespective of the time of their entry into the United States."

The Immigration Act of February 5, 1917 is found in 39 Stat. 874.

[2] Since June 14, 1940 the immigration laws have been administered by the Attorney General. Reorganization Plan No. V, effective June 14, 1940. 54 Stat. 230, 1238, 5 U. S. C. fol. 133t, 5 U. S. C. 133v.

[3] The Regulations of the Immigration and Naturalization Service provide that the alien shall be accorded a hearing before an immigrant inspector to determine whether he is subject to deportation on the charges stated in the warrant of arrest, at which hearing the alien is entitled to representation by counsel and to offer evidence in his behalf. As soon as practicable after the hearing has been concluded, the inspector is required to prepare a memorandum setting forth a

a member of or affiliated with either of those organizations at any time after he entered this country. The Attorney General reviewed the decision of the Board and rendered an opinion in which he made findings in accordance with those proposed by the inspector and ordered Harry Bridges to be deported. A warrant of deportation was issued. Harry Bridges surrendered himself to the custody of respondent and challenged the legality of his detention by a petition for a writ of *habeas corpus* in the District Court for the Northern District of California. That court denied the petition and remanded petitioner to the custody of respondent. 49 F. Supp. 292. The Circuit Court of Appeals affirmed by a divided vote. 144 F. 2d 927, 944. The case is here on a petition for a writ of certiorari which we granted because of the serious character of the questions which are presented.

As we have said, Harry Bridges came here from Australia in 1920. He has not returned to Australia since that time. He was a longshoreman. In 1933 he became active in trade-union work on the water front in San Francisco. The Attorney General found that he had "done much to improve the conditions that existed among the longshoremen." He reorganized and headed up the International

summary of the evidence adduced at the hearing, his proposed findings of fact and conclusions of law, and a proposed order, which are to be furnished to the alien or his counsel, who may file exception thereto and submit a brief, 8 C. F. R., 1941 Supp., 150.6, 150.7. The case is then heard by the Board of Immigration Appeals, a body authorized to perform the functions of the Attorney General in relation to deportation, but responsible solely to him. 8 C. F. R., 1940 Supp., 90.2–90.3. If exceptions have been filed, oral argument before the Board is permitted. *Ibid.*, 90.5. Where a member of the Board dissents, where the Board certifies that a question of difficulty is involved, or in any case in which the Attorney General directs, the Board must refer the case to the Attorney General for review. If the Attorney General reverses the decision of the Board, the Attorney General must state in writing his conclusions and the reasons for his decision. *Ibid.*, 90.12.

Longshoremen's Association, an American Federation of Labor union. He led the maritime workers' strike on the Pacific Coast in 1934. He was president of the local International Longshoremen's Association from 1934 to 1936 and was Pacific Coast president in 1936. In 1937 his union broke with the American Federation of Labor, changed its name to International Longshoremen and Warehousemen's Union, and became affiliated with the Committee for Industrial Organization. Bridges was elected Pacific Coast District President of that union and has held the office ever since. He also holds several important offices in the C. I. O.

The two grounds on which the deportation order rests— that Harry Bridges at one time had been both "affiliated" with the Communist party and a member of it—present different questions with which we deal separately.

*Affiliation.* The statute defines affiliation as follows:

"For the purpose of this section: (1) the giving, loaning or promising of money or any thing of value to be used for the advising, advocacy, or teaching of any doctrine above enumerated shall constitute the advising, advocacy, or teaching of such doctrine; and (2) the giving, loaning or promising of money or any thing of value to any organization, association, society, or group, of the character above described shall constitute affiliation therewith; but nothing in this paragraph shall be taken as an exclusive definition of advising, advocacy, teaching, or affiliation." 41 Stat. 1009, 8 U. S. C. § 137f.

The doctrine referred to is the overthrow of the government by force or violence.[4] The organizations or groups referred to are those which advise and teach that doctrine or which write, circulate, display and the like or have in their possession for such purpose any written or printed matter of that character.

---

[4] See note 1, *supra.*

In ruling on the question whether an alien had been "affiliated" with the Communist Party and therefore could be deported, the court in *United States* v. *Reimer,* 79 F. 2d 315, 317, said that such an affiliation was not proved "unless the alien is shown to have so conducted himself that he has brought about a status of mutual recognition that he may be relied on to co-operate with the Communist Party on a fairly permanent basis. He must be more than merely in sympathy with its aims or even willing to aid it in a casual, intermittent way. Affiliation includes an element of dependability upon which the organization can rely which, though not equivalent to membership duty, does rest upon a course of conduct that could not be abruptly ended without giving at least reasonable cause for the charge of a breach of good faith." The same idea was expressed by Dean Landis in the first Bridges' report. After stating that "affiliation" implies a "stronger bond" than "association," he went on to say: "In the corporate field its use embraces not the casual affinity of an occasional similarity of objective, but ties and connections that, though less than that complete control which parent possesses over subsidiary, are nevertheless sufficient to create a continuing relationship that embraces both units within the concept of a system. In the field of eleemosynary and political organization the same basic idea prevails." And he concluded: "Persons engaged in bitter industrial struggles tend to seek help and assistance from every available source. But the intermittent solicitation and acceptance of such help must be shown to have ripened into those bonds of mutual cooperation and alliance that entail continuing reciprocal duties and responsibilities before they can be deemed to come within the statutory requirement of affiliation. . . . To expand that statutory definition to embrace within its terms *ad hoc* cooperation on objectives whose pursuit is clearly allowable under our constitutional system, or

friendly associations that have not been shown to have resulted in the employment of illegal means, is warranted neither by reason nor by law."

The legislative history throws little light on the meaning of "affiliation" as used in the statute. It imports, however, less than membership but more than sympathy. By the terms of the statute it includes those who contribute money or anything of value to an organization which believes in, advises, advocates, or teaches the overthrow of our government by force or violence. That example throws light on the meaning of the term "affiliation." He who renders financial assistance to any organization may generally be said to approve of its objectives or aims. So Congress declared in the case of an alien who contributed to the treasury of an organization whose aim was to overthrow the government by force and violence. But he who cooperates with such an organization only in its *wholly lawful activities* cannot by that fact be said as a matter of law to be "affiliated" with it. Nor is it conclusive that the cooperation was more than intermittent and showed a rather consistent course of conduct. Common sense indicates that the term "affiliation" in this setting should be construed more narrowly. Individuals, like nations, may cooperate in a common cause over a period of months or years though their ultimate aims do not coincide. Alliances for limited objectives are well known. Certainly those who joined forces with Russia to defeat the Nazis may not be said to have made an alliance to spread the cause of Communism. An individual who makes contributions to feed hungry men does not become "affiliated" with the Communist cause because those men are Communists. A different result is not necessarily indicated if aid is given to or received from a proscribed organization in order to win a legitimate objective in a domestic controversy. Whether intermittent or repeated, the act or acts tending to prove "affiliation" must be of

that quality which indicates an adherence to or a furtherance of the purposes or objectives of the proscribed organization as distinguished from mere cooperation with it in lawful activities. The act or acts must evidence a working alliance to bring the program to fruition.

We are satisfied that the term "affiliation" was not so construed either by Judge Sears or by the Attorney General. The reports made in this case contain no precise formulation of the standard which was employed. But the way in which the term "affiliation" was used and applied convinces us that it was given a looser and more expansive meaning than the statute permits. Judge Sears in his report stated that "Affiliation is clearly a word of broader content than membership, and of narrower content than sympathy. Generally, there will be some continuity of relationship to bring the word into application." But he concluded that that was not necessarily so in view of the statutory definition. And he added: "Affiliation may doubtless be shown circumstantially. Assisting in the enterprises of an organization, securing members for it, taking part in meetings organized and directed by or on behalf of the organization, would all tend to show affiliation. The weight to be given to such evidence is, of course, determined by the trier of the fact." That view was apparently shared by the Attorney General. But the broad sweep which was given the term in its application to the facts of this case is illustrated by the following excerpt from the Attorney General's report:

"Judge Sears summarizes Bridges' attitude towards the Communist Party and its policies by saying that the 'isolated instances,' while not evidence to establish membership in or affiliation with the Communist Party, nevertheless show a sympathetic or cooperative attitude on his part to the Party, and form 'a pattern which is more consistent with the conclusion that the alien followed this course of conduct as an affiliate of the Communist Party,

rather than as a matter of chance coincidence.' This conclusion, said Judge Sears, was strengthened by his consistently favoring nondiscrimination against union men because of Communist membership; and by his excoriating 'red baiters,' as he called those who took an opposite view, which 'amounted to cooperation with the Communist Party in carrying out its program of penetration and boring from within'."

But when we turn to the facts of this case we have little more than a course of conduct which reveals cooperation with Communist groups for the attainment of wholly lawful objectives.

The associations which Harry Bridges had with various Communist groups seem to indicate no more than cooperative measures to attain objectives which were wholly legitimate. The link by which it is sought to tie him to subversive activities is an exceedingly tenuous one, if it may be said to exist at all. The Trade Union Unity League was found to be a Communist organization. It chartered the Marine Workers' Industrial Union in 1930, which continued until 1935 and was found to be a proscribed organization. That union launched the Waterfront Worker, a mimeographed sheet, in 1932. The Attorney General sustained Judge Sears' finding that Bridges sponsored it and was responsible for its publication shortly after it first appeared in 1932 and down to its abandonment in 1936. The paper acknowledged the assistance of the MWIU prior to September 15, 1933. The question when Bridges took over the paper was closely contested, the Board of Immigration Appeals finding that Bridges became connected with it about September 15, 1933, after the MWIU had abandoned it. The finding of Judge Sears, approved by the Attorney General, that the paper was an instrument of the MWIU and the Communist Party from December 1932 to its abandonment in 1936 and that it was under the domination and control

of those organizations during that period rested primarily on the following grounds: "(1) The acknowledged cooperation with the M. W. I. U., in the early issues of the paper and subsequent favorable treatment of the M. W. I. U., T. U. U. L., and other Communist-sponsored organizations during the paper's entire existence. (2) Consistent attacks upon the so-called 'reactionary' leaders of the A. F. of L. (3) Support of the Communist candidates for political office. (4) Advice to read Communist literature. (5) The use of addresses of Communists or Communist-affiliated organizations." But when the evidence underlying these findings is examined it is found to be devoid of any showing that the Waterfront Worker advocated overthrow of the government by force. It was a militant trade-union journal. It aired the grievances of the longshoreman. It discussed national affairs affecting the interests of working men. It declared against war. But we have found no evidence whatsoever which suggests that it advocated the overthrow of the government by force. Nor is there any finding that Bridges took over this project with the view of doing more than advancing the lawful cause of unionism. The advice to support for office certain candidates said to be Communists was based entirely on the platform on which they ran—cash relief; abolition of vagrancy laws; no evictions; gas, water and electricity for the unemployed; and unemployment relief. The advice to read Communist literature was not general; it was specifically addressed to the comparative merits of those publications and other papers on the truthfulness of labor news. The use of addresses of Communist organizations, especially stressed by the Attorney General, was said by Judge Sears to demonstrate "a close cooperation with the Communists and Communist Organizations." But close cooperation is not sufficient to establish an "affiliation" within the meaning of the statute. It must evidence a working alliance to bring the proscribed program to fruition.

It must be remembered that the Marine Workers' Industrial Union was not a sham or pretense. It was a genuine union. It was found to have, and we assume it did have, the illegitimate objective of overthrowing the government by force. But it also had the objective of improving the lot of its members in the normal trade union sense. One who cooperated with it in promoting its legitimate objectives certainly could not by that fact alone be said to sponsor or approve of its general or unlawful objectives. But unless he also joined in that over-all program, he would not be "affiliated" with the Communist cause in the sense in which the statute uses the term.

Whether one could be a member of that union without becoming "affiliated" with the Communist Party within the meaning of the statute, we need not decide. For Harry Bridges was never a member of it. To say that his cooperation with it made him in turn "affiliated" with the Communist Party is to impute to him belief in and adherence to its general or unlawful objectives. In that connection, it must be remembered that although deportation technically is not criminal punishment (*Johannessen* v. *United States,* 225 U. S. 227, 242; *Bugajewitz* v. *Adams,* 228 U. S. 585, 591; *Mahler* v. *Eby,* 264 U. S. 32, 39), it may nevertheless visit as great a hardship as the deprivation of the right to pursue a vocation or a calling. Cf. *Cummings* v. *Missouri,* 4 Wall. 277; *Ex parte Garland,* 4 Wall. 333. As stated by Mr. Justice Brandeis speaking for the Court in *Ng Fung Ho* v. *White,* 259 U. S. 276, 284, deportation may result in the loss "of all that makes life worth living."

We cannot assume that Congress meant to employ the term "affiliation" in a broad, fluid sense which would visit such hardship on an alien for slight or insubstantial reasons. It is clear that Congress desired to have the country rid of those aliens who embraced the political faith of force and violence. But we cannot believe that Congress intended to cast so wide a net as to reach those whose ideas

and program, though coinciding with the legitimate aims of such groups, nevertheless fell far short of overthrowing the government by force and violence.  Freedom of speech and of press is accorded aliens residing in this country. *Bridges* v. *California,* 314 U. S. 252.  So far as this record shows the literature published by Harry Bridges, the utterances made by him were entitled to that protection.  They revealed a militant advocacy of the cause of trade-unionism.  But they did not teach or advocate or advise the subversive conduct condemned by the statute.

Inference must be piled on inference to impute belief in Harry Bridges of the revolutionary aims of the groups whose aid and assistance he employed in his endeavor to improve the lot of the workingmen on the water front. That he enlisted such aid is not denied.  He justified that course on the grounds of expediency—to get such help as he could to aid the cause of his union.[5]  But there is evidence that he opposed the Communist tactics of fomenting strikes; that he believed in the policy of arbitration and direct negotiation to settle labor disputes, with the strike reserved only as a last resort.  As Dean Landis stated in the first report:

---

[5] As respects printing releases of the Communist Party in a union paper, he testified:

"As I understand, the question was my position in regard to printing official Communist releases.  I still say it might depend.  For example, if—there was a lot of trouble up there at that time, a lot of action and tieups.  I believe that if the Communist Party happened to send in a statement saying that they would do everything they could to support the particular dispute at that time in behalf of the Union position, my position would be that I wouldn't have any great objection to seeing that carried in the Union paper."

As respects voting for a political candidate known to be a Communist, he testified:

"The question of support only goes to whether he is a unionist or not.  If he is a bad unionist, we don't care what he is, we are against him; if he is a good one, we don't care what he is, we are for him. His first allegiance must be·for the union."

"Bridges' own statement of his political beliefs and disbeliefs is important. It was given not only without reserve but vigorously as dogma and faiths of which the man was proud and which represented in his mind the aims of his existence. It was a fighting apologia that refused to temper itself to the winds of caution. It was an avowal of sympathy with many of the objectives that the Communist Party at times has embraced, an expression of disbelief that the methods they wished to employ were as revolutionary as they generally seem, but it was unequivocal in its distrust of tactics other than those that are generally included within the concept of democratic methods. That Bridges' aims are energetically radical may be admitted, but the proof fails to establish that the methods he seeks to employ to realize them are other than those that the framework of democratic and constitutional government permits."

That observation is equally pertinent to the record before us. We cannot construe "affiliation" as used in the statute to bring such conduct and attitudes within its reach. Whether the evidence would justify a finding of "affiliation" in the strict sense in which the statute uses the term is not for us to say. An act innocent on its face may be done with an evil purpose. But where the fate of a human being is at stake the presence of the evil purpose may not be left to conjecture. In these *habeas corpus* proceedings we do not review the evidence beyond ascertaining that there is some evidence to support the deportation order. *Vajtauer* v. *Commissioner*, 273 U. S. 103, 106. But detention under an invalid order of deportation is established where an alien is ordered deported for reasons not specified by Congress. *Mahler* v. *Eby, supra.* That is the case here. For our review of the record convinces us that the finding of "affiliation" was based on too loose a meaning of the term.

*Membership.* The evidence of "affiliation" was used not only to support the finding that Harry Bridges had

been "affiliated" with the Communist party but also to corroborate the finding that at one time he had been a member of that organization. We may assume that such evidence, though falling short of the requirements of "affiliation," might be admissible for the latter purpose. But the difficulty is that the finding of membership, like the finding of affiliation, has an infirmity which may be challenged in this attack on the legality of Harry Bridges' detention under the deportation order.

Rule 150.1 (c) of the Regulations of the Immigration and Naturalization Service (8 C. F. R., 1941 Supp., 150.1 (c)) provides: "All statements secured from the alien or any other person during the investigation, which are to be used as evidence, shall be taken down in writing; and the investigating officer shall ask the person interrogated to sign the statement. Whenever such a recorded statement is to be obtained from any person, the investigating officer shall identify himself to such person and the interrogation of that person shall be under oath or affirmation. Whenever a recorded statement is to be obtained from a person under investigation, he shall be warned that any statement made by him may be used as evidence in any subsequent proceeding." And Rule 150.6 (i) provides in part: "A recorded statement made by the alien (other than a General Information Form) or by any other person during an investigation may be received in evidence only if the maker of such statement is unavailable or refuses to testify at the warrant hearing or gives testimony contradicting the statements made during the investigation."

O'Neil was a government witness. He was intimate with Harry Bridges. During the course of the examination, O'Neil was asked about statements which he allegedly had made to investigating officers some months earlier. These statements were not signed by O'Neil. They were not made by interrogation under oath. And it was not

shown that O'Neil was asked to swear and sign; or that, being asked, he refused. They were read into the record and verified by the stenographer who took them down. And an officer testified that later O'Neil had repeated the statements to him and to other witnesses. These statements were that O'Neil joined the Communist Party in December, 1936; that he walked into Bridges' office one day in 1937 and saw Bridges pasting assessment stamps in a Communist Party book; and that Bridges reminded O'Neil that he had not been attending party meetings. O'Neil admitted making statements to the investigating officers but denied making those particular statements.

Judge Sears admitted the statements not for purposes of impeachment but as substantive evidence. The Board of Immigration Appeals and the Attorney General both conceded that the statements were admitted in violation of Rules 150.1 (c) and 150.6 (i).[6] The Board held that it was error to consider the statements as affirmative, probative evidence. The Attorney General ruled: "Had the

---

[6] We accept that construction of the Rules. For Rule 150.6 (i) when read in conjunction with Rule 150.1 (c) fairly means (1) that an investigating officer in obtaining a "recorded statement" must obtain the statement by interrogation under oath and seek to obtain it over the signature of the maker, and (2) that only such a "recorded statement," so safeguarded, may be used as evidence when the maker of the statement gives contradictory testimony on the stand. It is true that Rule 150.6 (i) also provides that "An affidavit of an inspector as to the statements made by the alien or any other person during an investigation may be received in evidence, otherwise than in support of the testimony of the inspector, only if the maker of such statement is unavailable or refuses to testify at the warrant hearing or gives testimony contradicting the statement and the inspector is unavailable to testify in person." If we assume that that provision creates an exception from the general rule in case of the inspector who is unavailable to testify in person, we can hardly infer that the exception was designed to swallow the general rule. The deep-rooted policy of the law towards hearsay evidence cautions against such a loose reading of these fundamental procedural safeguards.

alien raised the question at the time of the hearing, compliance with the Departmental Regulations would have been obligatory and a deliberate rejection of a request to exclude the testimony would have rendered appropriate the objections now raised by the Board. No objection having been raised by the alien throughout the hearing, however, he waived the right to object on the technical ground that the statement was not taken in accordance with the rules." One difficulty with that position is that Bridges did protest before Judge Sears over the use of the statement. He* maintained that they were erroneously received and were without probative value though he did not rest his objection on the regulations. But there is a more fundamental difficulty. The original deciding body is not the inspector who hears the case. He merely submits a memorandum setting forth the evidence adduced at the hearing, his proposed findings of fact and conclusions of law, and a proposed order.[7] The case then is heard by the Board of Immigration Appeals, which is authorized to perform the functions of the Attorney General in relation to deportation. 8 C. F. R., 1940 Supp., §§ 90.2, 90.3. And the case may then go to the Attorney General for decision. If the objection to evidence on the ground that it violates the governing regulations is made before the agency entrusted with the duty of deciding whether a case for deportation has been established, it is made soon enough. Objection to the use of these statements as probative evidence was made before both the Board and the Attorney General. It was specifically objected that the statements did not qualify under the regulations.

The rules are designed to protect the interests of the alien and to afford him due process of law. It is the action of the deciding body, not the recommendation of the inspector, which determines whether the alien will be de-

---

[7] See note 3, *supra.*

ported. The rules afford protection at that crucial stage of the proceedings or not at all. The person to whom the power to deport has been entrusted is the Attorney General or such agency as he designates. 8 U. S. C. § 155. He is an original trier of fact on the whole record. It is his decision to deport an alien that Congress has made "final." 8 U. S. C. § 155. Accordingly, it is no answer to say that the rules may be disregarded because they were not called to the attention of the inspector.

It was assumed in *Bilokumsky* v. *Tod*, 263 U. S. 149, 155, that "one under investigation with a view to deportation is legally entitled to insist upon the observance of rules promulgated by the Secretary pursuant to law." We adhere to that principle. For these rules are designed as safeguards against essentially unfair procedures. The importance of this particular rule may not be gainsaid. A written statement at the earlier interviews under oath and signed by O'Neil would have afforded protection against mistakes in hearing, mistakes in memory, mistakes in transcription. Statements made under those conditions would have an important safeguard—the fear of prosecution for perjury. Moreover, if O'Neil had been asked to swear to and sign the statements and had refused to do so, the fact of his refusal would have weight in evaluating the truth of the statements.

The statements which O'Neil allegedly made were hearsay. We may assume they would be admissible for purposes of impeachment. But they certainly would not be admissible in any criminal case as substantive evidence. *Hickory* v. *United States*, 151 U. S. 303, 309, *United States* v. *Block*, 88 F. 2d 618, 620. So to hold would allow men to be convicted on unsworn testimony of witnesses [8]—a

---

[8] We have here quite a different case from that where a prior statement of an alien, contradictory of testimony made at the hearing, is admitted. See *Chan Wong* v. *Nagle*, 17 F. 2d 987; *Ex parte Kishimoto*, 32 F. 2d 991; 4 Wigmore, Evidence (3rd ed.) § 1048.

practice which runs counter to the notions of fairness on which our legal system is founded.[9] There has been some relaxation of the rule in alien *exclusion* cases. See *United States* v. *Corsi*, 65 F. 2d 564. But we are dealing here with deportation of aliens whose roots may have become, as they are in the present case, deeply fixed in this land. It is true that the courts have been liberal in relaxing the ordinary rules of evidence in administrative hearings. Yet as was aptly stated in *Interstate Commerce Commission* v. *Louisville & Nashville R. Co.*, 227 U. S. 88, 93, "But the more liberal the practice in admitting testimony, the more imperative the obligation to preserve the essential rules of evidence by which rights are asserted or defended."

Here the liberty of an individual is at stake. Highly incriminating statements are used against him—statements which were unsworn and which under the governing regulations are inadmissible. We are dealing here with procedural requirements prescribed for the protection of the alien. Though deportation is not technically a criminal proceeding, it visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom. That deportation is a penalty—at times a most serious one—cannot be doubted. Meticulous care must be exercised lest the procedure by which he is deprived of that liberty not meet the essential standards of fairness.

On the record before us it is clear that the use of O'Neil's *ex parte* statements was highly prejudicial. Those unsworn statements of O'Neil and the testimony of one Lundeberg were accepted by the Attorney General as showing

---

[9] Dean Wigmore in his third edition of Evidence (1940) § 1018 (b) took the other position. But he added, "The contrary view, however, is the orthodox one. It is universally maintained by the Courts that Prior Self-Contradictions are not to be treated as having any *substantive* or *independent testimonial value.*"

that Bridges was a member of the Communist Party. There was other testimony but it was so "untrustworthy, contradictory, or unreliable" as to be rejected by the Attorney General. If the finding as to Lundeberg's testimony was treated by the Attorney General independently of his finding as to O'Neil's, we would have a different case. Then we would have to determine whether the testimony of Lundeberg alone was sufficient to sustain the order. But the Attorney General, unlike Judge Sears, did not separate the testimony of Lundeberg and that of O'Neil for the purpose of his finding as to membership. He lumped them together and found that between them their total weight was sufficient to tip the scales against Harry Bridges. He ruled that if the unsworn statements of O'Neil and the testimony of Lundeberg were believed "the doubt is decided." [10] It is thus apparent not only that the unsworn statements of O'Neil weighed heavily in the scales but also that it took those unsworn statements as well as Lundeberg's testimony to resolve the doubt on this sharply contested and close question. Whether the finding would have been made on this record

---

[10] The Attorney General stated, immediately prior to his analysis of the testimony of Lundeberg and O'Neil, the following: "Judge Sears examines in detail the evidence of fifteen witnesses as bearing on Bridges' membership in or affiliation with the Communist Party. Much of this evidence is rejected as being untrustworthy, contradictory, or unreliable. However, the evidence of two witnesses is accepted as showing that Bridges was a member of the party. If this evidence is believed—and Judge Sears believed it—the doubt is decided. The question is substantially one of credibility. The Review Board did not think the evidence credible. But it should be remembered that Judge Sears saw the witnesses on the stand, watched their demeanor and expression, and was in a far better position to judge their truthfulness than the Review Board, dealing with the cold print of the record.

"The two most important witnesses as to membership are Harry Lundeberg and James D. O'Neil."

from the testimony of Lundeberg alone is wholly conjectural and highly speculative. Not only was Lundeberg admittedly hostile to Bridges. Not only did the Attorney General fail to rule that on the basis of Lundeberg's testimony alone Bridges had been a member of the party. But beyond that, the Board of Immigration Appeals significantly concluded that apart from O'Neil's unsworn statements the evidence of Bridges' membership was too flimsy to support a finding. It is thus idle to consider what the Attorney General might have ruled on the basis of the other evidence before him. Cf. *United States* v. *Dunton,* 291 F. 905, 907. The issue of membership was too close and too crucial to the case to admit of mere speculation. Since it was error to admit O'Neil's unsworn statements against Bridges, since they were so crucial to the findings of membership, and since that issue was so close, we are unable to say that the order of deportation may be sustained without them.

In these *habeas corpus* proceedings the alien does not prove he had an unfair hearing merely by proving the decision to be wrong (*Tisi* v. *Tod,* 264 U. S. 131, 133) or by showing that incompetent evidence was admitted and considered. *Vajtauer* v. *Commissioner, supra,* p. 106. But the case is different where evidence was improperly received and where but for that evidence it is wholly speculative whether the requisite finding would have been made. Then there is deportation without a fair hearing, which may be corrected on *habeas corpus.* See *Vajtauer* v. *Commissioner, supra.*

Since Harry Bridges has been ordered deported on a misconstruction of the term "affiliation" as used in the statute and by reason of an unfair hearing on the question of his membership in the Communist Party, his detention under the warrant is unlawful. Accordingly, it is unnecessary for us to consider the larger constitutional questions

which have been advanced in the challenge to the legality of petitioner's detention under the deportation order.

The judgment below is

*Reversed.*

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

MR. JUSTICE MURPHY, concurring.

The record in this case will stand forever as a monument to man's intolerance of man.   Seldom if ever in the history of this nation has there been such a concentrated and relentless crusade to deport an individual because he dared to exercise the freedom that belongs to him as a human being and that is guaranteed to him by the Constitution.

For more than a decade powerful economic and social forces have combined with public and private agencies to seek the deportation of Harry Bridges, who came to this country in 1920 from Australia.   Emerging from the Pacific Coast maritime strike of 1934 as a recognized labor leader in that area, Bridges incurred the hatred and hostility of those whose interests coincided directly or indirectly with the "vicious and inhumane practices toward longshoremen," 144 F. 2d 927, 938, that Bridges was combatting.   His personal viewpoint on certain matters also antagonized many people of more conservative leanings. Agitation for his deportation arose.   Industrial and farming organizations, veterans' groups, city police departments and private undercover agents all joined in an unremitting effort to deport him on the ground that he was connected with organizations dedicated to the overthrow of the Government of the United States by force and violence.   Wire-tapping, searches and seizures without warrants and other forms of invasion of the right of privacy have been widely employed in this deportation drive.

This opposition to Bridges' presence in the United States has been as persistent as it has been undaunted by temporary setbacks to its aims. The Immigration and Naturalization Service, after a thorough investigation of the original charges in 1934 and 1935, was unable to find even a "shred of evidence" warranting his deportation and the matter officially was dropped. But the campaign to banish him continued unabated. Eventually a warrant was issued by the Immigration and Naturalization Service in 1938 seeking his deportation. A clean bill of health was given him, however, after a full hearing before a special examiner, Dean Landis of the Harvard Law School. This only led to demands that the deportation laws be changed to make sure that Bridges was exiled. Thereupon a special bill was introduced and actually passed by the House of Representatives directing the Attorney General "notwithstanding any other provisions of law" forthwith to take into custody and deport Harry Bridges, "whose presence in this country the Congress deems hurtful." H. R. 9766, 76th Cong., 3rd Sess. Fortunately this bill died in a Senate committee after the Attorney General denounced it as inconsistent with the American practice and tradition of due process of law. S. Rep. No. 2031, 76th Cong., 3rd Sess., p. 9.

As a substitute for this direct legislative assault upon Bridges, Congress amended the deportation law by enacting § 23 of the Alien Registration Act of 1940, 54 Stat. 673. This amendment set aside this Court's decision in *Kessler* v. *Strecker,* 307 U. S. 22, by making it clear that an alien could be deported if, at the time of entering the United States or at any time thereafter, he was a member of or affiliated with an organization advocating the forceful overthrow of the Government. It thus was no longer necessary that the alien be an affiliate or member at the time of the issuance of the warrant of arrest. In the words of the author of this amendment: "It is my joy to

announce that this bill will do, in a perfectly legal and constitutional manner, what the bill specifically aimed at the deportation of Harry Bridges seeks to accomplish. This bill changes the law so that the Department of Justice should now have little trouble in deporting Harry Bridges and all others of similar ilk." 86 Cong. Rec. 9031.

This prophecy was quickly realized, to the satisfaction of the vast interests arrayed against Bridges. A warrant for his arrest and deportation under this new statutory provision was issued in 1941, followed by a hearing before another special examiner, Judge Sears. Evidence was presented by the Government on practically the same matters as in the first proceeding. This time, however, the examiner discovered sufficient grounds for recommending deportation. Although the Board of Immigration Appeals unanimously rejected this recommendation, the Attorney General, without holding a hearing or listening to argument, reversed the Board and ordered the deportation of Bridges.

It is not surprising that the background and intensity of this effort to deport one individual should result in a singular lack of due process of law. Much of the evidence presented by the Government has been described by the Attorney General as "untrustworthy, contradictory, or unreliable." The remaining Government evidence can scarcely be described in more generous terms. And the Court's opinion, in which I join, demonstrates that the proceeding had its validity further undermined by a misconception of the statutory term "affiliation" and by the improper use of hearsay statements.

But the Constitution has been more than a silent, anemic witness to this proceeding. It has not stood idly by while one of its subjects is being excommunicated from this nation without the slightest proof that his presence constitutes a clear and present danger to the public welfare. Nor has it remained aloof while this individual is

being deported, resulting in the loss "of all that makes life worth living," *Ng Fung Ho* v. *White,* 259 U. S. 276, 284, on a finding that, regardless of his personal beliefs, he was a member and an affiliate of an organization advocating the forceful overthrow of the Government. When the immutable freedoms guaranteed by the Bill of Rights have been so openly and concededly ignored, the full wrath of constitutional condemnation descends upon the action taken by the Government. And only by expressing that wrath can we give form and substance to "the great, the indispensable democratic freedoms," *Thomas* v. *Collins,* 323 U. S. 516, 530, to which this nation is dedicated.

The unconstitutionality of the statute in issue and the invalidity of the proceeding brought pursuant thereto are obvious. As construed and applied in this case, the statute calls for the deportation of Harry Bridges after a fair hearing in which "some" evidence is established that he was a member or affiliate of an organization advocating the forceful overthrow of the Government. Such a provision rests its claim to legality upon one basic assumption, an assumption that is obnoxious and intolerable when viewed in light of the supernal heritage and ideals of this nation.

This assumption underlying the statute is that the "plenary" power of Congress to deport resident aliens is unaffected by the guarantee of substantive freedoms contained in the Bill of Rights. In other words, as the Government has urged before us, the deportation power of Congress "is unaffected by considerations which in other contexts might justify the striking down of legislation as an unwarranted abridgment of constitutionally guaranteed rights of free speech and association." From this premise it follows that Congress may constitutionally deport aliens for whatever reasons it may choose, limited only by the due process requirement of a fair hearing. The color of their skin, their racial background or their religious faith may

conceivably be used as the basis for their banishment. An alien who merely writes or utters a statement critical of the Government, or who subscribes to an unpopular political or social philosophy, or who affiliates with a labor union, or who distributes religious handbills on the street corner, may be subjected to the legislative whim of deportation.

I am unable to believe that the Constitution sanctions that assumption or the consequences that logically and inevitably flow from its application. The power to exclude and deport aliens is one springing out of the inherent sovereignty of the United States. *Chinese Exclusion Case,* 130 U. S. 581. Since an alien obviously brings with him no constitutional rights, Congress may exclude him in the first instance for whatever reason it sees fit. *Turner* v. *Williams,* 194 U. S. 279. The Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores. But once an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders. Such rights include those protected by the First and the Fifth Amendments and by the due process clause of the Fourteenth Amendment. None of these provisions acknowledges any distinction between citizens and resident aliens. They extend their inalienable privileges to all "persons" and guard against any encroachment on those rights by federal or state authority. Indeed, this Court has previously and expressly recognized that Harry Bridges, the alien, possesses the right to free speech and free press and that the Constitution will defend him in the exercise of that right. *Bridges* v. *California,* 314 U. S. 252.

Since resident aliens have constitutional rights, it follows that Congress may not ignore them in the exercise of its "plenary" power of deportation. As this Court said in a previous exclusion case, "But this court has never held, nor

must we now be understood as holding, that administrative officers, when executing the provisions of a statute involving the liberty of persons, may disregard the fundamental principles that inhere in 'due process of law' as understood at the time of the adoption of the Constitution." *Japanese Immigrant Case,* 189 U. S. 86, 100. No less may a statute on its face disregard the basic freedoms that the Constitution guarantees to resident aliens. The CHIEF JUSTICE, in his dissenting opinion in *Jones* v. *Opelika,* 316 U. S. 584, 609, has stated that "The First Amendment prohibits all laws abridging freedom of press and religion, not merely some laws or all except tax laws." By the same token, the First Amendment and other portions of the Bill of Rights make no exception in favor of deportation laws or laws enacted pursuant to a "plenary" power of the Government. Hence the very provisions of the Constitution negative the proposition that Congress, in the exercise of a "plenary" power, may override the rights of those who are numbered among the beneficiaries of the Bill of Rights.

Any other conclusion would make our constitutional safeguards transitory and discriminatory in nature. Thus the Government would be precluded from enjoining or imprisoning an alien for exercising his freedom of speech. But the Government at the same time would be free, from a constitutional standpoint, to deport him for exercising that very same freedom. The alien would be fully clothed with his constitutional rights when defending himself in a court of law, but he would be stripped of those rights when deportation officials encircle him. I cannot agree that the framers of the Constitution meant to make such an empty mockery of human freedom.

Since the basic assumption of the statute is false, the Bill of Rights must be brought to bear. And when that is done several constitutional infirmities are apparent in this legislation. See 52 Yale L. J. 108. As shown by the

record in this case, Harry Bridges has done no more than exercise his personal right to free speech and association. Yet upon proof of that fact, he would be subject to deportation under the statute. The invalidity of legislation of such nature is inescapable.

*First.* The deportation statute completely ignores the traditional American doctrine requiring personal guilt rather than guilt by association or imputation before a penalty or punishment is inflicted.

The statute does not require that an alien, to be deportable, must personally advocate or believe in the forceful overthrow of the Government. It is enough if he is a member or an affiliate of an organization which advocates such a doctrine. And in this case the Government admits that it has neither claimed nor attempted to prove that Harry Bridges personally advocated or believed in the proscribed doctrine. There is no evidence, moreover, that he understood the Communist Party to advocate violent revolution or that he ever committed or tried to commit an overt act directed to the realization of such an aim.

The doctrine of personal guilt is one of the most fundamental principles of our jurisprudence. It partakes of the very essence of the concept of freedom and due process of law. *Schneiderman* v. *United States,* 320 U. S. 118, 154. It prevents the persecution of the innocent for the beliefs and actions of others. See Chafee, Free Speech in the United States (1941), pp. 472–475.

Yet the deportation statute on its face and in its present application flatly disregards this rule. It condemns an alien to exile for beliefs and teachings to which he may not personally subscribe and of which he may not even be aware. This fact alone is enough to invalidate the legislation. Cf. *DeJonge* v. *Oregon,* 299 U. S. 353; *Herndon* v. *Lowry,* 301 U. S. 242; *Whitney* v. *California,* 274 U. S. 357.

It is no answer that a deportation proceeding is technically non-criminal in nature and that a deportable alien is

not adjudged guilty of a "crime." Those are over-subtle niceties that shed their significance when we are concerned with safeguarding the ideals of the Bill of Rights. The impact of deportation upon the life of an alien is often as great if not greater than the imposition of a criminal sentence. A deported alien may lose his family, his friends and his livelihood forever. Return to his native land may result in poverty, persecution and even death. There is thus no justifiable reason for discarding the democratic and humane tenets of our legal system and descending to the practices of despotism in dealing with deportation.

*Second.* The deportation statute is further invalid under the "clear and present danger" test enunciated in *Schenck* v. *United States,* 249 U. S. 47.

It is clear that if an organization advocated and was capable of causing immediate and serious violence in order to overthrow the Government and if an alien member or affiliate personally joined in such advocacy a clear and present danger to the public welfare would be demonstrated and the Government would then have the power to deport or otherwise punish the alien. But the statute in issue makes no attempt to require such proof. It is apparently satisfied if an organization at any time since the alien became a member or affiliate advocated as a theoretical doctrine the use of force under hypothetical conditions at some indefinite future time. It is immaterial whether the organization presently advocates such an abstract doctrine or whether the alien is presently a member or an affiliate or whether he presently adheres to the organization's views. It matters not that an alien member never knew or understood the organization's illegal aim or that he may have resigned in protest upon learning of it. It appears to be enough that the organization at one time advocated the unlawful doctrine and that the alien was a member or affiliate at some time in the past, even if for no longer than one minute. 86 Cong. Rec. 9032. It is not

even clear that the organization's advocacy of violent revolution and an alien's membership or affiliation must coincide in point of time. Such a statute fails to satisfy any rational or realistic test. It certainly does not pretend to require proof of a clear and present danger so as properly to negative the presumption that individual rights are supreme under the Constitution. It therefore founders in constitutional waters.

The Government frankly concedes that this case was not tried or decided below on the theory that the "clear and present danger" test had any application. Proof of Bridges' membership and affiliation with the Communist Party was shown by some of the most tenuous and unreliable evidence ever to be introduced in an administrative or legal proceeding. Proof that the Communist Party advocates the theoretical or ultimate overthrow of the Government by force was demonstrated by resort to some rather ancient party documents, certain other general Communist literature and oral corroborating testimony of Government witnesses. Not the slightest evidence was introduced to show that either Bridges or the Communist Party seriously and imminently threatens to uproot the Government by force or violence.

Deportation, with all its grave consequences, should not be sanctioned on such weak and unconvincing proof of a real and imminent threat to our national security. Congress has ample power to protect the United States from internal revolution and anarchy without abandoning the ideals of freedom and tolerance. We as a nation lose part of our greatness whenever we deport or punish those who merely exercise their freedoms in an unpopular though innocuous manner. The strength of this nation is weakened more by those who suppress the freedom of others than by those who are allowed freely to think and act as their consciences dictate.

Our concern in this case does not halt with the fate of Harry Bridges, an alien whose constitutional rights have

been grossly violated. The significance of this case is far-reaching. The liberties of the 3,500,000 other aliens in this nation are also at stake. Many of these aliens, like many of our forebears, were driven from their original homelands by bigoted authorities who denied the existence of freedom and tolerance. It would be a dismal prospect for them to discover that their freedom in the United States is dependent upon their conformity to the popular notions of the moment. But they need not make that discovery. The Bill of Rights belongs to them as well as to all citizens. It protects them as long as they reside within the boundaries of our land. It protects them in the exercise of the great individual rights necessary to a sound political and economic democracy. Neither injunction, fine, imprisonment nor deportation can be utilized to restrict or prevent the exercise of intellectual freedom. Only by zealously guarding the rights of the most humble, the most unorthodox and the most despised among us can freedom flourish and endure in our land.

MR. CHIEF JUSTICE STONE.

MR. JUSTICE ROBERTS, MR. JUSTICE FRANKFURTER and I think that the deportation order should be sustained and the judgment below affirmed.

This case presents no novel question. Under our Constitution and laws, Congress has its functions, the Attorney General his, and the courts theirs in regard to the deportation of aliens. Our function is a very limited one. In this case our decision turns on the application of the long-settled rule that in reviewing the fact findings of administrative officers or agencies, courts are without authority to set aside their findings if they are supported by evidence. This Court has not heretofore departed from that rule in reviewing deportation orders upon collateral attack by habeas corpus, *Tisi* v. *Tod*, 264 U. S. 131; *Vajtauer* v. *Commissioner of Immigration*, 273 U. S. 103, 106;

*Costanzo* v. *Tillinghast,* 287 U. S. 341, 343, and cases cited, and there is no occasion for its doing so now.

Congress, in the exercise of its plenary power over the deportation of aliens, has directed the deportation of any alien who, at the time of his entry into the United States or at any time thereafter, has been a member of or affiliated with "any organization, association, society, or group, that believes in, advises, advocates, or teaches . . . the overthrow by force or violence of the Government of the United States . . . [or] that writes, circulates, distributes, prints, publishes, or displays . . . any written or printed matter" advising, advocating or teaching the overthrow by force or violence of the Government of the United States. §§ 1 and 2 of the Act of October 16, 1918, c. 186, 40 Stat. 1012, as amended by the Act of June 5, 1920, c. 251, 41 Stat. 1008–1009, and the Act of June 28, 1940, c. 439, 54 Stat. 673, 8 U. S. C. § 137.

Congress has committed the conduct of deportation proceedings to an administrative officer, the Attorney General, with no provision for direct review of his action by the courts. Instead it has provided that his decision shall be "final," 8 U. S. C. § 155, as it may constitutionally do. *Zakonaite* v. *Wolf,* 226 U. S. 272, 275, and cases cited. Only in the exercise of their authority to issue writs of habeas corpus, may courts inquire whether the Attorney General has exceeded his statutory authority or acted contrary to law or the Constitution. *Bilokumsky* v. *Tod,* 263 U. S. 149, 153; *Vajtauer* v. *Commissioner of Immigration, supra.* And when the authority to deport the alien turns on a determination of fact by the Attorney General, the courts, as we have said, are without authority to disturb his finding if it has the support of evidence of any probative value.

In this proceeding, the Attorney General, following the prescribed procedure, issued a warrant for the arrest of petitioner, charging that after his entry into the United

States, he had been a member of and affiliated with organizations of the type referred to in the part of the deportation statute we have quoted. The Attorney General, as authorized by the applicable statutes and regulations, appointed the Honorable Charles B. Sears, an experienced judge formerly of the Court of Appeals of New York, to act as an inspector to hear evidence on the charges. The hearings before Judge Sears extended over a period of nearly three months, in the course of which evidence was offered by the Government and by petitioner, who was represented by counsel. The evidence is contained in more than seventy-five hundred typewritten pages of the record and in three hundred and fifty-nine exhibits. The record in this Court covers some seventy-eight hundred printed pages.

At the conclusion of the hearings, Judge Sears made his memorandum decision, in which he found that the Communist Party of the United States and the Marine Workers' Industrial Union were, at all relevant times, each an organization which believed in and advocated the overthrow by force and violence of the Government of the United States, and that the Communist Party also wrote, circulated, distributed, printed, published and displayed printed matter advising, advocating or teaching the overthrow by force and violence of the Government of the United States. Those findings are not challenged here. Judge Sears also found that petitioner was subject to deportation, and recommended that he be deported, on two separate and independent grounds: (a) that he was a member of the Communist Party of the United States, and (b) that he was affiliated with the Communist Party and with the Marine Workers' Industrial Union, which was a part of the Communist Party of the United States.

As we are of opinion that the finding of Bridges' membership in the Communist Party, standing alone, supports the deportation order, and that the finding is supported

by evidence, we deem it unnecessary to consider other contentions to which the Court's opinion is principally directed. The evidence of membership is of two kinds, and may be briefly summarized. It consists of background testimony of numerous witnesses, much of it uncontradicted, which Judge Sears found to be true and which showed that Bridges had long and continuously associated with Communists and Communist Party organizations, and had exhibited a sympathetic attitude toward the Communist Party and its program. More important and decisive of the issue now before us is evidence concerning Bridges' interviews with two witnesses which, if true, as to either interview, showed that Bridges, both by his words and conduct, proved his membership in the Party.

One witness, Lundeberg, a prominent labor leader, testified that he had dined at Bridges' home in 1935; that Bridges, along with a member of the Communist Party who was also present, urged the witness to join the Communist Party; and that this took place in the presence of two members of Bridges' family and his secretary. Lundeberg testified that Bridges said on that occasion: "You don't have to be afraid because nobody has to know you are a member of the Communist Party . . . You don't have to be afraid because I am one too . . . I am a member of the Communist Party." Bridges denied making these statements, although he admitted that the witness had dined with him at his home in 1935 when several members of his family were present. The others said to be present failed to testify and their absence from the witness stand is unexplained.

The other witness, O'Neil, who was the publicity director of the C. I. O., a member of the Communist Party, and an intimate of Bridges, and who shared offices with him after 1936, made a statement to members of the Federal Bureau of Investigation that in 1937 he saw Bridges in his office pasting assessment stamps (receipts for pay-

ment of Communist Party dues) in a Communist Party book, which the witness was certain was petitioner's membership book in the Party, and that Bridges on several occasions reminded the witness that he had not been attending Party meetings. The accuracy of the statement, as given in evidence, was verified by the stenographer who, testifying as a witness, read the statement from her stenographic notes. Major Schofield, a Special Assistant to the Attorney General, testified that O'Neil had repeated substantially the same statement to him in the presence of two witnesses. O'Neil, who had demonstrated his hostility to the Government and his unwillingness to testify, testified, when he was called as a Government witness, that he had made two statements at the times and in the manner indicated, and that they were true statements, but he denied that he had said that Bridges was a Communist or that he had seen him pasting assessment stamps in a Communist Party book.

Judge Sears, who saw and heard the witnesses, ruled that the prior statements of O'Neil were admissible. He declared in his decision that he believed and accepted as true Lundeberg's testimony and O'Neil's prior statements; that each supported his findings that Bridges was a Party member; and that each was corroborated by Bridges' associations with Communist Party members and organizations as well as by other circumstances, appearing in the testimony, and which it is unnecessary to detail. On review the Board of Immigration Appeals proposed findings, which would have rejected the findings of Judge Sears as unsupported by evidence. The Attorney General declined to follow the recommendations of the Board, but instead adopted the findings of Judge Sears. He therefore ordered petitioner's deportation.

On this record we have only a single question to decide. Was there some evidence supporting the findings of Judge Sears and the Attorney General that Bridges was a mem-

ber of the Communist Party? If there was, then, as we have said, we have no further function to perform and the judgment must be affirmed. To determine that issue we need not look beyond the testimony of Lundeberg. If his testimony is to be believed, Bridges admitted his membership in the Communist Party in circumstances which carry conviction of the truth of the fact admitted. It was for the hearing officer, Judge Sears, and the trier of fact, the Attorney General, not the courts, to say whether Lundeberg was to be believed. In deciding that issue, the administrative officials could take into account, as they did, the facts that four persons, all evidently friendly to Bridges, and who according to the testimony were present at the interview between Lundeberg and Bridges, failed to testify and that Bridges' failure to call them as witnesses stands unexplained. *Interstate Circuit* v. *United States,* 306 U. S. 208, 225–226, and cases cited.

The conclusion which the two administrative officers, charged with finding the facts, have drawn from this testimony, is not to be brushed aside by saying that the O'Neil statements are inadmissible as evidence and that the triers of fact would not or might not have accepted Lundeberg's testimony without O'Neil's. For neither Judge Sears nor the Attorney General made acceptance of the one dependent on acceptance of the other. Not a word in Judge Sears' decision or that of the Attorney General suggests that they did not regard the testimony of Lundeberg or the statements of O'Neil, each without the other, as sufficient to support their finding that Bridges was a member of the Communist Party. On the contrary, each declared that he accepted Lundeberg's testimony and O'Neil's statements, and that he believed each. It can hardly be said, without more, that they did not accept the credited evidence furnished by each witness as sufficient in itself to support their finding of Party membership.

But the record does not stop there. Both Judge Sears and the Attorney General examined the Lundeberg and

the O'Neil testimony separately and made separate findings as to the effect to be given to each. The findings of Judge Sears, adopted by the Attorney General, show affirmatively that both officials accepted the testimony of Lundeberg and the statements of O'Neil, as independently sufficient to support the finding that Bridges was a member of the Communist Party.

Lundeberg's testimony related wholly to his interview with Bridges in 1935. Of Lundeberg's testimony, Judge Sears said:

"The question for me to answer is whether the Government has established that Bridges admitted to Lundeberg at the time specified that he was a member of the Communist Party. If he did so admit, it is in my judgment conclusive evidence of the fact."

After examining Lundeberg's testimony, and considering his demeanor on the witness stand, and the strongly corroborative circumstance that others, who were in a position to deny his testimony, had failed to do so, Judge Sears said:

"I reach the conclusion, therefore, that the conversation did take place substantially as testified by Lundeberg and that Bridges did then and there admit to Lundeberg that he was a member of the Communist Party."

Thus Judge Sears clearly stated that Lundeberg's testimony alone was sufficient to sustain a finding that petitioner was a member of the Communist Party in 1935.

At the conclusion of his like examination of O'Neil's statements, which related wholly to O'Neil's interview with Bridges in 1937, Judge Sears said:

"Having thus concluded that O'Neil made the statements attributed to him by Mrs. Segerstrom [the stenographer] and Major Schofield, I am also convinced of their truth. I do not overlook O'Neil's repudiation of the statements or Bridges' denials of the facts recited therein.

"Taking into consideration all the evidence bearing on this phase of the proceeding, I conclude that it is estab-

lished that the narrations contained in O'Neil's statement to Mrs. Segerstrom and in his conversation in the presence of Major Schofield are the truth, and I find the fact that in accordance therewith that Bridges was in 1937, a member of the Communist Party."

The Attorney General, after a like separate examination of the Lundeberg and O'Neil evidence, made it perfectly clear that he accepted Judge Sears' findings as to each. He too said that the question as to each witness was a matter of his credibility, and that he believed the witness, rather than petitioner, because on this point he accepted Judge Sears' finding that they, and not Bridges, were to be believed. The conclusion is inescapable that the adminstrative officers, whose concurrent findings we are bound to accept if supported by evidence, did not make their finding, from the Lundeberg testimony, that Bridges was a Party member in 1935, dependent in any degree upon their finding, from the O'Neil evidence, that Bridges was a member of the Party in 1937, or vice versa. This is particularly the case since Lundeberg's and O'Neil's testimony was not cumulative as to membership in the Communist Party at a single time; each testified as to a different time, some two years apart.

It is true that the Attorney General, in an introductory paragraph in his decision, said: "However, the evidence of two witnesses is accepted as showing that Bridges was a member of the Party. If this evidence is believed—and Judge Sears believed it—the doubt is decided." But he went on to say that the question was one of credibility, and that Judge Sears, who saw the witnesses, was in a far better position to decide that question than the Review Board. He continued with a separate discussion of each witness and his testimony. He concluded as to each, without any reference to the other, that the witness should be believed rather than Bridges, and that Judge Sears' conclusion as to the credibility of each (which was not de-

pendent upon his like conclusion as to the other) should be sustained.

The record thus conclusively shows that both Judge Sears and the Attorney General found, on the Lundeberg testimony alone, that Bridges was a member of the Communist Party in 1935. That finding is supported by the sworn testimony of Lundeberg, which was admissible in evidence and has probative force. As it supports the concurrent findings of Judge Sears and of the Attorney General that Bridges was a Party member at that time, we cannot reject that finding.

What we have said is not to be taken as conceding that O'Neil's prior statements were improperly admitted. The Court rejects them on two grounds, that they were admitted in violation of departmental regulations, and that as hearsay they were so untrustworthy as to make them inadmissible in any event. We think neither ground tenable.

We find nothing in the rules and regulations applicable to deportation cases calling for the exclusion of the testimony concerning O'Neil's prior statements.[1] Rule 150.1 provides that statements secured during an investigation "which are to be used as evidence" shall be made under oath, and taken down in writing and signed by the person

---

[1] The opinion of the Court states that the Attorney General conceded that the evidence was admitted in violation of the Rules. The Department of Justice made no such concession in this Court. And we think that the Attorney General's decision, which is quoted by the Court, when fairly read, stated no more than that the objection based on the rules came too late; that had the question been raised in time, compliance with the rules would have been required (it was not stated what compliance with the rules would have entailed); that if the Inspector, after deliberation, then had rejected the objection based on the rules, it would have been "appropriate" to raise the objections before the Board of Immigration Appeals; and that the right to raise the objection had been waived. Plainly he did not state or suggest that objections to their admissibility would have been valid if timely made, and there was no occasion for him to consider that question.

interrogated. Such a statement is denominated a "recorded statement" by the rule. The purpose of securing recorded statements is obviously to preserve evidence in a readily available form, and to insure that before a warrant of arrest is issued, there is credible evidence that the person investigated is an alien and is subject to deportation. It provides neither explicitly nor by implication that statements other than recorded statements are inadmissible.

It is true that Rule 150.6 excludes "recorded" statements unless the maker of the statement is unavailable, refuses to testify or gives inconsistent testimony. These restrictions on the admissibility of ex parte recorded statements hardly can be strained into a sweeping exclusion of all unrecorded statements, otherwise admissible in the proceeding. Indeed the rule on its face quite clearly permits an inspector to testify as to statements made by persons who are unavailable, refuse to testify or give testimony contradictory to a prior statement.[2] The statements as to which the inspector may testify are not restricted by the terms of the rule to recorded statements. Hence Judge Sears' ruling that Mrs. Segerstrom and Major Schofield could testify, under oath, that O'Neil had made statements to them in contradiction with his testimony on the stand, was not in conflict with the departmental rules.

But it is said that the evidence was in any event inadmissible. That the evidence would be inadmissible in a criminal proceeding is irrelevant here, since a deportation proceeding is not a criminal proceeding. *Bugajewitz* v.

---

[2] Rule 150.6 (i) provides, in part: "An affidavit of an inspector as to the statements made by the alien or any other person during an investigation may be received in evidence, otherwise than in support of the testimony of the inspector, only if the maker of such statement is unavailable or refuses to testify at the warrant hearing or gives testimony contradicting the statement and the inspector is unavailable to testify in person."

*Adams,* 228 U. S. 585, 591 and cases cited; *Bilokumsky* v. *Tod, supra,* 154–155; *Mahler* v. *Eby,* 264 U. S. 32, 39. And no principle of law has been better settled than that the technical rules for the exclusion of evidence, applicable in trials in courts, particularly the hearsay rule, need not be followed in deportation proceedings, *Bilokumsky* v. *Tod, supra,* 157, and cases cited; *Tisi* v. *Tod, supra,* 133; *Vajtauer* v. *Commissioner of Immigration, supra,* 106, more than in other administrative proceedings. *Consolidated Edison Co.* v. *Labor Board,* 305 U. S. 197, 229–230, and cases cited; *Opp Cotton Mills* v. *Administrator,* 312 U. S. 126, 155, and cases cited. The only objections that can be taken to the evidence in such proceedings are not to its admissibility, but to its probative value. See *Consolidated Edison Co.* v. *Labor Board, supra,* 230.

Judge Sears completely and accurately ruled on the admissibility of Mrs. Segerstrom's and Major Schofield's testimony as to O'Neil's earlier statements to them. He said:

"Whatever may be the common-law rule in relation to the reception of such evidence as that of Mrs. Segerstrom and Major Schofield, in this hearing the parties are not confined to common-law proof. Hearsay is admissible but the character of such evidence is an element to be used in its evaluation. The principal reason for the exclusion of hearsay at common law is that the opportunity for cross-examination is absent. In the present case, the sanction of cross-examination was present. Although the statement given to Mrs. Segerstrom and the statement made in the presence of Major Schofield were not under oath, there is something equivalent, for O'Neil testified on the stand that he told the truth in his interview with the agents of the F. B. I. and in the interview at which Major Schofield was present. There is in my opinion, therefore, every reason why this testimony should

be heard and considered as substantive proof. It falls within the definition of substantial evidence heretofore quoted."

He appended in a footnote:

"(1) This view is fully supported by Dean Wigmore in the 3rd edition of his work (3 Wigmore, Evidence, 3rd ed., section 1018 (b)): 'It does not follow, however, that Prior Self-Contradictions, when admitted, are to be treated as having no *affirmative testimonial* value, and that any such credit is to be strictly denied them in the mind of the tribunal. The only ground for so doing would be the Hearsay rule. But the theory of the Hearsay rule is that an extrajudicial statement is rejected because it was made out of Court by an absent person not subject to cross-examination. . . . Here, however, by hypothesis the witness is present and subject to cross-examination. There is ample opportunity to test him as to the basis for his former statement. The whole purpose of the Hearsay rule has been already satisfied. Hence there is nothing to prevent the tribunal from giving such testimonial credit to the extrajudicial statement as it may seem to deserve. Psychologically of course, the one statement is as useful to consider as the other; and everyday experience outside of court-rooms is in accord.' "

See also *Opp Cotton Mills* v. *Administrator, supra,* 155, and cases cited.[3]

---

[3] Wigmore concedes that his views have not been accepted by the courts generally. But, as we have said, the technical rules of evidence applied by the courts are not applicable to administrative proceedings. *Consolidated Edison Co.* v. *Labor Board,* 305 U. S. 197, 229–230, and cases cited; *Opp Cotton Mills* v. *Administrator,* 312 U. S. 126, 155, and cases cited. For that reason the considerations suggested by Wigmore are controlling here and the Attorney General and Judge Sears could rightly consider O'Neil's statements as proof of the matters stated. *Bilokumsky* v. *Tod,* 263 U. S. 149, 157, and cases cited; *Tisi* v. *Tod,* 264 U. S. 131, 133; *Vajtauer* v. *Commissioner of Immigration,* 273 U. S. 103, 106.

We think that the O'Neil statements were properly admitted and that, independently of the Lundeberg testimony, they warranted the Attorney General's finding that Bridges was a Party member.

With increasing frequency this Court is called upon to apply the rule, which it has followed for many years, in deportation cases as well as in other reviews of administrative proceedings, that when there is evidence more than a scintilla, and not unbelievable on its face, it is for the administrative officer to determine its credibility and weight. *Warehouse Co.* v. *United States,* 283 U. S. 501, 508; *Trade Commission* v. *Education Society,* 302 U. S. 112, 117; *Consolidated Edison Co.* v. *Labor Board, supra,* 229; *Labor Board* v. *Nevada Copper Co.,* 316 U. S. 105; *Marshall* v. *Pletz,* 317 U. S. 383, 388; *Labor Board* v. *Southern Bell Co.,* 319 U. S. 50, 60; *Medo Corp.* v. *Labor Board,* 321 U. S. 678, 681–682. We cannot rightly reject the administrative finding here and accept, as we do almost each week, particularly in our denials of certiorari, the findings of administrative agencies which rest on the tenuous support of evidence far less persuasive than the present record presents. That is especially the case here, since the Attorney General, the district court and the court of appeals have all concurred in the conclusion that the evidence is sufficient to support the findings. *Coryell* v. *Phipps,* 317 U. S. 406, 411; *United States* v. *Johnson,* 319 U. S. 503, 518; *Mahnich* v. *Southern S. S. Co.,* 321 U. S. 96, 99, and cases cited; *Goodyear Co.* v. *Ray-O-Vac Co.,* 321 U. S. 275, 278.

Petitioner has made a number of other arguments which the Court finds it unnecessary to discuss. We think that they too are without merit. We would affirm the judgment.