# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  50622-0-II |
| Respondent, | |
| v. | |
| JOSHUA EARL HARRIS, | UNPUBLISHED OPINION |
| Appellant. | |

WORSWICK, J. — Joshua Earl Harris appeals his convictions for communication with a minor for immoral purposes, third degree attempted rape of a child, and possession of a controlled substance.  Harris argues that there was insufficient evidence to show he had the specific intent to rape a child or that he took a substantial step toward raping a child, and that his due process rights were violated when law enforcement did not follow the Internet Crimes Against Children (ICAC) Standards and engaged in outrageous conduct.  Further, Harris argues that the court imposed impermissible legal financial obligations (LFOs).

We hold that sufficient evidence supports Harris's convictions, that his due process rights were not violated, and that the court did not impermissibly impose LFOs.  Thus, we affirm.

### FACTS

The ICAC Task Force Program is part of a congressional directive to the Attorney General of the United States to implement a national strategy for child exploitation prevention and interdiction.  34 U.S.C. §§ 21111-21112.  As directed by Congress, the Department of Justice created the ICAC Operational and Investigative Standards to provide procedural and

investigatory standards for these investigations. The ICAC Task Force Program includes state and local law enforcement task forces to combat Internet crimes against children. 34 U.S.C. § 21113. One of these task forces is the Washington State ICAC Task Force. The Washington State ICAC Task Force has an interagency agreement with the Vancouver Police Department (VPD) in which VPD agrees to adhere to the ICAC Standards.

Regarding Harris's case, Detective Robert Givens of the VPD placed an advertisement in the Casual Encounters section on Craigslist. The ad read, "[S]kipping school today want to chat W4M Vancouver. I'm just a girl ditching today from school. You want to chat with me? I'm pretty mellow. Send me a message. I'll be around gaming and chatting.[♥]" 3 Verbatim Report of Proceedings (VRP) at 362. W4M meant a woman looking for a male.

Harris, a 36-year-old man, responded to the ad. Detective Givens replied posing as "Julie Vincent,"[1] a nonexistent 14-year-old girl created for this investigation. 3 VRP at 366. Harris said, "I am 36, which I hope is not a deal breaker." 3 VRP at 367. Julie replied, "I'm 14. I'm okay if you're okay." 3 VRP at 367. Harris responded, "I suppose it is. I just wanted to chat anyway." 3 VRP at 367. Harris stated that by skipping school, he thought Julie was referring to college and requested they "keep it civil." 3 VRP at 367.

After chatting about video games, Harris asked Julie to send him a photograph. Craigslist blocked Julie's attempt to send a photograph, but Julie began chatting with Harris directly the following morning. Julie then sent a photograph to Harris. This photograph was of a female police officer who was over the age of 21. Harris said he did not think Julie looked 14 years old

---

[1] We use the law enforcement officer's undercover persona for clarity.

and asked if she was on Craigslist looking for older men.  He said, "If you want an older caring man's attention, I will gladly give it to you."  3 VRP at 375.  When Julie asked what kind of attention, Harris said, "Whatever you wanted."  3 VRP at 375.

He then asked, "Skipping school today?  I have some time.  I could come get [you] and go do something or go somewhere and chat."  3 VRP at 375.  Julie again asked what kind of attention Harris would give her.  He responded, "Well, the want is strong.  Very.  I want to taste you. . . . I really shouldn't say such things, but G*d d**n you're fine."  3 VRP at 376.  Harris then offered Julie marijuana and methamphetamine.  Julie asked Harris to tell her "about the other stuff first" and he replied, "I really want to perform oral right now. . . . I really want you."  3 VRP at 376.  Julie asked, "For real or just online?"  3 VRP at 376.  Harris replied, "I hope I don't frighten you.  And even if you just want to chat, I'm fine with that.  Only issue if [I] perform orally on you, you'll be upset the rest of your life because I am the best there is.  Not a lie. Not fake, not online, but real."  3 VRP at 376.

Julie asked if Harris wanted to try to meet and he responded, "Yes, please."  3 VRP at 377.  Harris said, "I don't like how our society stats [sic] that teenagers can't have sex. Bulls**t."  3 VRP at 377.  In graphic detail, Harris then described how he would perform oral sex on Julie.  Harris said, "I am not a pedo[phile], but I have always wanted to be with a young woman and taste that delicious peach."  3 VRP at 378.  He said, "I want to f**k you . . . . Sensual passionate love making like you'll never forget."  3 VRP at 380.

Harris wanted to see Julie that day, and the two discussed where they would meet.  Harris said, "We have to meet somewhere away from your house . . . [t]o pick you up, I mean."  3 VRP at 379.  Harris arranged to meet Julie at a Starbucks in Vancouver.  Harris arrived at the

Starbucks and texted Julie that he was "going to make this not just the best you've had, but the emotional journey I will take you on will be more fulfilling than you can ever hope for."  3 VRP at 384.

Detective Givens was sitting inside the Starbucks messaging Harris when Harris walked in.  Detective Givens texted Harris that Julie was still walking to the location.  Harris walked out of the Starbucks and police officers arrested him.  Police officers found a box of condoms in Harris's jacket pocket and methamphetamine in Harris's vehicle.  The State charged Harris with communication with a minor for immoral purposes, third degree attempted rape of a child, and possession of a controlled substance—methamphetamine.  At trial, witnesses testified to the above facts.  The jury found Harris guilty of all three counts.  Harris appeals his convictions.

## ANALYSIS

### I. SUFFICIENCY OF THE EVIDENCE

Harris argues that the evidence was insufficient to support his conviction for attempted third degree rape of a child.  We disagree.

Evidence is sufficient to support a guilty verdict if any rational trier of fact, viewing the evidence in the light most favorable to the State, could find the elements of the charged crime beyond a reasonable doubt.  *State v. Farnsworth*, 185 Wn.2d 768, 775, 374 P.3d 1152 (2016). "In claiming insufficient evidence, the defendant necessarily admits the truth of the State's evidence and all reasonable inferences that can be drawn from it."  *State v. Homan*, 181 Wn.2d 102, 106, 330 P.3d 182 (2014).  Such inferences must be drawn in favor of the State and interpreted most strongly against the defendant.  *State v. Kintz*, 169 Wn.2d 537, 551, 238 P.3d 470 (2010).  We defer to the jury on issues of conflicting testimony, credibility of witnesses, and

the persuasiveness of the evidence. *State v. Andy*, 182 Wn.2d 294, 303, 340 P.3d 840 (2014). Circumstantial evidence is not any less reliable or probative than direct evidence in reviewing the sufficiency of the evidence supporting a jury verdict. *Kintz*, 169 Wn.2d at 551.

To convict a defendant of attempted third degree rape of a child, the State must prove beyond a reasonable doubt that the defendant intended to have sexual intercourse and took a substantial step toward having sexual intercourse with a child between the ages of 14 and 16, who was not married to the defendant, and the defendant was at least forty-eight months older than the victim. RCW 9A.28.020(1); 9A.44.079(1); *see State v. Wilson*, 1 Wn. App. 2d 73, 83, 404 P.3d 76 (2017). Only the elements of "intent" and "substantial step" are at issue in this case.

A.      *Specific Intent*

Harris argues that the evidence was insufficient to support his conviction for attempted third degree rape of a child because the State failed to prove that Harris possessed the specific intent to have sexual intercourse with another who is at least fourteen years old but less than sixteen years old. Specifically, Harris argues that he possessed only the intent to have sexual intercourse with the adult woman in the photograph, not with 14-year-old Julie. We disagree.

The requisite intent required for attempted rape of a child is the intent to have sexual intercourse with a child. RCW 9A.28.020(1); 9A.44.079 (1); *State v. Johnson*, 173 Wn.2d 895, 908, 270 P.3d 591 (2012). To prove the specific intent element of attempted child rape, either the child's actual age or the defendant's belief in a fictitious age is material. *Johnson*, 173 Wn.2d at 909. When "a fictitious victim exists only within the context of the sting operation[,] her age can be established only by publication and receipt of the information." *Johnson*, 173 Wn.2d at 908. The State can show that the defendant knew the perceived victim's age through

5

the victim's communication and the defendant's receipt of the information. *Johnson*, 173 Wn.2d at 909.

Here, the State had to prove that Harris believed that Julie was between the ages of 14 and 16, regardless of whether she may have looked older. *See* RCW 9A.28.020(1); 9A.44.079(1). The photograph of a police officer in her twenties as "Julie" has no effect on Harris's specific intent to have sexual intercourse with a child he believed was 14-years-old.[2] *See Johnson*, 173 Wn.2d at 903-04. Julie said she was 14 years old and Harris acknowledged this. He made statements about her age and about how teenagers should be able to have sex. After learning the information about her age and making these statements, Harris still wanted to engage in sexual intercourse with Julie. Further, Harris went to the chosen meeting location with condoms in his jacket pocket. Viewed in a light most favorable to the prosecution, the State presented sufficient evidence that a reasonable jury could find Harris possessed the specific intent to intend to have sexual intercourse with a 14-year-old child.

B.      *Substantial Step towards Attempted Rape in the Third Degree*

Harris also argues that the State failed to prove Harris took a substantial step toward having sexual intercourse with a child and because Harris abandoned his plan to have sexual intercourse when he left the Starbucks. We disagree.

---

[2] In support of his argument, Harris points to *State v. Patel*, 170 Wn.2d 476, 242 P.3d 856 (2010). Harris cites *Patel* for the proposition that "a defendant who attempts to have sex with a person he believes is underage but is actually an adult . . . may not be convicted . . . ." *Patel*, 170 Wn.2d at 485. However this language was specifically disapproved in *Johnson*. *Johnson*, 173 Wn.2d at 904. Accordingly, Harris's reliance on *Patel* to support that he intended to have sexual intercourse with the adult woman in the photograph is misplaced. *Johnson*, 173 Wn.2d at 903-04.

To commit attempt, a defendant must take a substantial step toward the commission of a crime. RCW 9A.28.020(1). A substantial step is conduct strongly corroborative of the defendant's criminal purpose. *State v. Wilson*, 158 Wn. App. 305, 317, 242 P.3d 19 (2010). Mere preparation to commit a crime is not a substantial step toward the commission of that crime. *Wilson*, 158 Wn. App. at 317. However, "[a]ny slight act done in furtherance of a crime constitutes an attempt if it clearly shows the design of the individual to commit the crime." *State v. Price*, 103 Wn. App. 845, 852, 14 P.3d 841 (2000).

Conduct that may be indicative of a substantial step includes enticing or seeking to entice the perceived victim to go to the place where the crime may be committed. *State v. Townsend*, 105 Wn. App. 622, 631-32, 20 P.3d 1027 (2001). Once a substantial step is taken, the crime of attempt occurred and abandonment cannot be a defense. *State v. Workman*, 90 Wn.2d 443, 450, 584 P.2d 382 (1978).

Here, when viewed in a light most favorable to the State, a reasonable trier of fact could have found that Harris took a substantial step in attempting to have sexual intercourse with Julie. Harris made a variety of sexually explicit statements to Julie. Once they decided to meet, Harris drove to the determined location, Starbucks. Harris had a box of condoms in his pocket.

Harris also contends that since the meeting was at a Starbucks, Harris was not going to have sexual intercourse with Julie. However, this argument fails to view the evidence in the State's favor and ignores that Harris said he wanted "[t]o pick [Julie] up." 3 VRP at 379. All the evidence, viewed in the light most favorable to the State, would allow a reasonable trier of fact to conclude that Harris took a substantial step towards sexual intercourse with a child.

Harris further argues that he abandoned his attempt to engage in sexual intercourse when he left the Starbucks. But even assuming that Harris left the building in an attempt to abandon his plan and not to meet Julie whom he believed was walking toward the Starbucks, this action is immaterial. Once Harris took a substantial step and the crime of attempt was accomplished, Harris could not have abandoned that crime. *See Workman*, 90 Wn.2d at 450.

As a result, we hold that Harris's claims of insufficient evidence fail.

## II. DUE PROCESS

Harris argues his right to due process was violated. Specifically, he argues that law enforcement violated due process when it (1) did not follow ICAC Standards in conducting the sting operation and (2) engaged in outrageous conduct during its investigation. We disagree.

The State may not deprive a person of life, liberty, or property without due process of law. U.S. CONST. amend XIV, § 1; WASH. CONST. art I, § 3. A due process violation can be procedural or substantive. *See In re Bush*, 164 Wn.2d 697, 701, 193 P.3d 103 (2008). Procedural due process requires that an individual is given notice of the proceeding against them and an opportunity to be heard. *Bush*, 164 Wn.2d at 704. Apart from the fairness of procedures, substantive due process protects individuals against government conduct. *Bush*, 164 Wn.2d at 706. In this context, when the challenged government action is executive in nature, only outrageous conduct which shocks the conscience is a cognizable due process claim. *Bush*, 164 Wn.2d at 707.

The concept of outrageous conduct is founded on the principle that "the conduct of law enforcement . . . may be 'so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.'" *State v. Lively*, 130

Wn.2d 1, 19, 921 P.2d 1035 (1996) (quoting *United States v. Russell*, 411 U.S. 423, 431-32, 93 S. Ct. 1637, 36 L. Ed. 2d 366 (1973)). Whether law enforcement has engaged in outrageous conduct is a question of law that we review de novo. *Lively*, 130 Wn.2d at 19.

To determine whether law enforcement's conduct violated due process, we must assess the conduct based on the totality of the circumstances. *Lively*, 130 Wn.2d at 21. Law enforcement's conduct is outrageous and violates due process only when the conduct is so shocking that it violates fundamental fairness and the universal sense of fairness. *Lively*, 130 Wn.2d at 19. A claim based on outrageous conduct requires the defendant to demonstrate more than mere flagrant law enforcement conduct. *Lively*, 130 Wn.2d at 20. "Public policy allows for some deceitful conduct and violation of criminal laws by [law enforcement] in order to detect and eliminate criminal activity." *Lively*, 130 Wn.2d at 20. Outrageous conduct is not to be invoked each time law enforcement acts deceptively. *Lively*, 130 Wn.2d at 20. Instead, dismissal based on outrageous law enforcement conduct is reserved for only the most egregious circumstances. *Lively*, 130 Wn.2d at 20.

In evaluating whether law enforcement's conduct violated due process, this court considers several factors, including (1) "whether [law enforcement's] conduct instigated a crime or merely infiltrated ongoing criminal activity"; (2) "whether the defendant's reluctance to commit a crime was overcome by pleas of sympathy, promises of excessive profits, or persistent solicitation"; (3) "whether [law enforcement] controls the criminal activity or simply allows for the criminal activity to occur"; (4) "whether [law enforcement's] motive was to prevent crime or protect the public"; and (5) "whether [law enforcement's] conduct itself amounted to criminal

activity or conduct 'repugnant to a sense of justice.'" *Lively*, 130 Wn.2d at 22 (citations omitted) (quoting *People v. Isaacson*, 44 N.Y.2d 511, 521, 406 N.Y.S.2d 714, 378 N.E.2d 78 (1978)).

A.     *ICAC Standards*

Harris argues that federal law mandates compliance with ICAC Standards and that deviation by Detective Givens from the ICAC Standards is a violation of Harris's due process rights. We disagree.

The ICAC Task Force Program is part of a congressional directive to the Attorney General of the United States to implement a national strategy for child exploitation prevention and interdiction. 34 U.S.C. §§ 21111-21112. This program, which includes participation of state and local law enforcement task forces, aims to combat Internet crimes against children by increasing investigations, training, and public awareness. 34 U.S.C. § 21113. One of these task forces is the Washington State ICAC Task Force. In addition to other requirements, state and local law enforcement shall "establish or adopt investigative and prosecution standards, consistent with established norms, to which such task force shall comply;" and shall "seek to comply with national standards regarding the investigation and prosecution of Internet crimes against children, as set forth by the Attorney General, to the extent such standards are consistent with the law of the State where the task force is located." 34 U.S.C. § 21114(7), (11).

In accordance with the enacting statutes, the Department of Justice created the ICAC Operational and Investigative Standards. The Washington State ICAC Task Force has an interagency agreement with VPD in which VPD agrees to adhere to the ICAC Standards. The ICAC Standards require that investigations proceed in conformity with applicable laws and constitutional requirements. The ICAC Standards also state that "ICAC members should make

every reasonable effort to comply with these Standards. However . . . reasonable deviations from these Standards may occur." CP at 164.

The ICAC Standards go on to explain specific techniques for ICAC investigations including:

> 8.5    Visual depictions of any identifiable person used to represent an investigative persona or any identifiable minor, shall be only those of an Employee who has given his or her written consent and only if that Employee was at least 18 years old at the time of consent. Further, the depictions themselves may be of that Employee under the age of 18.

> 8.6    Absent prosecutorial input to the contrary, during online dialogue, officers shall allow the Investigative target to set the tone, pace, and subject matter of the online conversation[.]
> > 8.6.1   The above section (8.6) shall not be construed to prohibit Investigators from performing any of the following activities when initiating or conducting an Investigation: (a) posting information including visual depictions (image or video/printed or digital) to establish an online presence, (b) placing advertisements or posts, or (c) sending messages.

CP at 171-72.

B.    *Due Process Principles Applied to the ICAC*

Harris argues that Congress intended the ICAC Standards to be binding federal law on local ICAC task forces. Specifically, he contends that because the ICAC Standards are binding federal law, a violation of them is a violation of a defendant's right to due process. Harris argues that his due process rights were violated by investigatory tactics, namely, that Detective Givens improperly steered the tone, pace, and subject matter of the conversations with Harris towards sexual subjects and used a photograph of a woman over the age of 18.

Harris alleges a violation of federal law resulted in a violation of his right to due process. He cites only to one civil case for this contention, *United States. v. Caceres*, 440 U.S. 741, 99 S.

11

Ct. 1465, 59 L. Ed. 2d 733 (1979). *Caceres* states that when compliance with an agency regulation is mandated by the Constitution or federal law, a court has a duty to enforce the regulation. *Caceres*, 440 U.S. at 749. The court there pointed to an immigration case, where agency procedural rules were designed "to protect the interests of the alien and to afford him due process of law." *Bridges v. Wixon*, 326 U.S. 135, 152, 65 S. Ct. 1443, 89 L. Ed. 2103 (1945). Harris cites no criminal law to support his assertion and cites to no case holding that a criminal defendant's due process rights are per se violated simply by a police department's failure to follow investigative standards. We assume that absent a citation to authority, Harris has found none. *See State v. Johnson*, 119 Wn.2d 167, 171, 829 P.2d 1082 (1992).

C.      *Procedural Due Process*

Because Harris's claim does not concern notice or an opportunity to be heard during an adjudicatory proceeding, Harris is presumably arguing substantive due process, not procedural. *See Bush*, 164 Wn.2d at 704, 706. To the extent Harris argues a procedural due process violation, there is no violation of binding federal law here. As a law enforcement agency partner of the Washington ICAC Task Force, VPD was required to adopt investigatory standards when pursuing Internet crimes. 34 U.S.C. § 21114(7). Although VPD agreed to follow the ICAC Standards, federal law does not require VPD to follow the ICAC Standards. Harris does not point to any violation of other statutory or constitutional law related to investigatory standards. Further, even if VPD was federally required to follow the ICAC Standards, the ICAC Standards give no indication of an intent to provide potential targets with procedural due process rights.

*See Bridges*, 326 U.S. at 152. Accordingly, Harris fails to raise a violation of his right to procedural due process.[3]

D.      *Substantive Due Process*

Alternatively, if Harris is arguing a substantive due process violation, then this court applies the *Lively* factors to determine whether police conduct was so outrageous as to violate Harris's right to due process. *See Lively*, 130 Wn.2d at 22. Harris argues that VPD did not adhere to the ICAC Standards and engaged in outrageous police conduct. Specifically, Harris argues that Detective Givens targeted him at random on Craigslist and that Detective Givens steered the conversation to sexual material in violation of the ICAC Standards. Harris also contends that the use of the photograph of the VPD officer in her twenties was impermissible.[4] We hold that Harris's right to due process was not violated.

Looking to the totality of the circumstances, Harris fails to show that law enforcement's conduct during the undercover Craigslist operation was so outrageous that it violated due process. Here, Detective Givens posted an ad on the Craigslist's Casual Encounters page. He did not target Harris or instigate a crime. Rather, Detective Givens posted an advertisement that Harris responded to. Harris instigated criminal activity by responding to the ad and attempting sexual contact with a child.

---

[3] Moreover, as discussed below, VPD did not violate the ICAC Standards.

[4] Harris argues that the use of the photograph "did not accurately reveal Harris'[s] disposition. Instead, Harris was arrested, convicted, and sentenced for pursuing sexual intercourse with another adult." Br. of Appellant at 16. To the extent that Harris argues his sexual disposition, we addressed this argument above.

Further, Detective Givens allowed Harris to set the tone, pace, and subject matter of the conversation, permitting Harris's criminal activity to occur. Detective Givens asked Harris to clarify what he meant when he said he would give Julie "an older man's caring attention." 3 VRP at 375. Although Harris argues he was reluctant, there is little evidence of this reluctance in the record. Even if a reluctance could be gleaned from the record, law enforcement did not overcome Harris's reluctance with pleas of sympathy or persistent solicitation. Harris was the first to mention sexually explicit acts to Julie and meeting her in person. Harris explained in graphic detail the types of sexual activities he was hoping to perform on Julie. And the only evidence Harris points to as proof that Detective Givens steered the conversation toward sexual contact, were two questions where Julie asked Harris to clarify his comments.

A review of the record clearly shows that Harris was the party instigating sexual content in the conversations. As a result, Detective Givens followed ICAC Standard 8.6.

VPD did not engage in criminal conduct during the undercover operation. Rather, Detective Givens merely acted deceptively on Craigslist by posing as a 14-year-old girl skipping school. Detective Givens sent Harris a photograph taken for the purpose of this investigation by a VPD officer who was over age 18. While the photograph was deceptive, its use was to prevent Internet crimes against children and was not repugnant to a sense of justice. Moreover, the photograph met ICAC Standard 8.5.

Here, VPD did not violate the ICAC Standards nor engage in outrageous police conduct. Accordingly, viewing the totality of the circumstances, law enforcement's conduct during the undercover operation was not so shocking that it violated fundamental fairness and the universal

14

sense of fairness. Further, VPD followed the ICAC Standards when conducting the investigation. Thus, we hold that law enforcement's conduct did not violate due process.

III. SUPPLEMENTAL BRIEFING ON LEGAL FINANCIAL OBLIGATIONS

Harris filed a supplemental brief regarding the imposition certain fees in light of *State v. Ramirez*, 191 Wn.2d 732, 426 P.3d 714 (2018). Harris argues that we should strike (1) a $200 DNA (deoxyribonucleic acid) collection fee because Harris had been previously convicted of a felony, so DNA collection had already occurred; and (2) the criminal filing fee. Harris's arguments fail.

A. *DNA Collection Fee*

Harris requests we strike a $200 DNA collection fee because he is a previously convicted felon. First, Harris misrepresents the record. Harris's listed criminal history does not contain any felonies, only a number of misdemeanors. Second, the trial court waived the DNA collection fee.

The trial court filed two judgments and sentences. On the first judgment and sentence, the trial ordered Harris's DNA be collected, but it waived the $100 fee. On the second, and most recent, judgment and sentence, the trial court indicated that the first felony order contained all LFOs for Harris. Accordingly, this shows that no DNA collection fee was imposed at all. Accordingly, Harris's argument fails.

B. *Criminal Filing Fee*

Harris also argues that the criminal filing fee must be stricken. But like the DNA fee, the trial court did not order Harris to pay a criminal filing fee. As a result, there does not appear to be any action we could take to provide the requested relief in this motion. Without the

No. 50622-0-II

imposition of either fee, we cannot strike nonexistent fees from the judgment and sentencing orders.

We affirm Harris's convictions. And because the trial court did not impose either the DNA fee or the criminal filing fee, we hold that his arguments regarding his LFOs fail.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____

Worswick, P.J.

We concur:

_____

Johanson, J.

_____

Bjorgen, J.